UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UTICA MUTUAL INSURANCE COMPANY,
                                       Plaintiff,                Civ. Action No.
        -v.-                                                6:09-CV-0853
                                                                    (DNH)(GHL)
FIREMAN'S FUND INSURANCE COMPANY
                                   Defendant.

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| HUNTON & WILLIAMS LLP<br>Counsel for Plaintiff<br>1751 Pinnacle Drive, Suite 1700<br>McLean, VA 22102 | JOSEPH J. SALTARELLI, ESQ.<br>SYED S. AHMAD, ESQ.<br>WALTER J. ANDREWS, ESQ. |
| CHADBOURNE & PARKE LLP<br>Counsel for Defendant<br>1200 New Hampshire Avenue, NW<br>Washington, DC 20036 | JOHN F. FINNEGAN, ESQ.<br>MARY A. LOPATTO, ESQ.<br>NANCY E. MONARCH, ESQ. |

GEORGE H. LOWE, United States Magistrate Judge

## ORDER

### BACKGROUND

     Plaintiff Utica Mutual Insurance Company ("Plaintiff" or "Utica Mutual") moves to disqualify Defendant's counsel, Chadbourne & Parke LLP ("Chadbourne"). Dkt. No. 41. Plaintiff argues that Chadbourne attorney Samantha Miller has a conflict of interest, which is imputed to Chadbourne, based on Ms. Miller's prior representation of Plaintiff. Defendant Fireman's Fund Insurance Company ("Defendant" or "Fireman's Fund") opposes the motion to disqualify, arguing that Plaintiff fails to establish a "substantial relationship" between the subject matter of Ms. Miller's prior representation of Plaintiff and the issues in the present lawsuit. Defendant also argues that, even if Ms. Miller is disqualified, her disqualification should not be imputed to Chadbourne. *Id.,* at 18-30. Utica Mutual's


motion is denied.

## DISCUSSION

### I. ATTORNEY MILLER

In *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, the Second Circuit held that, in cases of successive representation, an attorney may be disqualified if

(1) the moving party is a former client of the adverse party's counsel;

(2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and

(3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005) (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)).

Here the Defendant does not dispute that Ms. Miller represented Plaintiff during her former employment with the law firms Shaw Pittman and Hunton & Williams LLP ("Hunton"). With regard to the "substantial relationship" test, the Court is given pause by the Second Circuit's teaching that there must be

> ...a showing that the relationship between issues in the prior and present cases is "patently clear". Put more specifically, disqualification has been granted or approved recently only when the issues have been "identical" or "essentially the same".

*Gov't of India v. Cook Indus., Inc.,* 569 F.2d 737, 739-40 (2d Cir. 1978). The Court is far from certain that this stringent standard has been met but, since Defendant and Chadbourne have determined that Ms. Miller is not going to be working on this matter, the Court will resolve all doubts in favor of Plaintiff, and will assume *arguendo* that there is a substantial relationship between the subject matter of

2

Ms. Miller's prior representation of Plaintiff and the issues in this lawsuit.  Finally, in cases where the substantial relationship test has been satisfied, it is generally found that the attorney sought to be disqualified might have had access to relevant privileged information, and attorney disqualification is ordered.  *See Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737 (2d Cir. 1978); *Emle Indus. v. Patentex,* 478 F.2d 562 (2d Cir. 1973); *Consol. Theatres v. Warner Bros. Circuit Mgmt.  Corp.,* 316 F.2d 920 (2d Cir. 1954; *Hammond v. Goodyear Tire& Rubber Co.,* 933 F. Supp. 197 (N.D.N.Y. 1996; *U.S. Football League v. Nat'l Football League,* 605 F. Supp. 1448 (S.D.N.Y. 1985).

Accordingly, the Court finds that Ms. Miller is disqualified from representing the Defendant in this action.

### II. CHADBOURNE

"An attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences."  *Hempstead Video*, 409 F.3d at 133; see also *Kassis v. Teacher's Ins. and Annuity Ass'n*, 93 N.Y.2d 611, 616 (N.Y. 1999) ("[T]he general rule [is] that where an attorney working in a law firm is disqualified from undertaking a subsequent representation opposing a former client, all the attorneys in that firm are likewise precluded from such representation.").  However, the presumption of confidence sharing can be rebutted by the party seeking to avoid disqualification.  *Hempstead Video*, 409 F.3d at 133. One form of rebuttal is isolation of the tainted attorney:

> We see no reason why, in appropriate cases and on convincing facts, isolation - whether it results from the intentional construction of a "Chinese Wall", or from *de facto* separation that effectively protects against any sharing of confidential information - cannot adequately protect against taint.

*Id.*, at 138.

3

In addressing the issue before it, the Court is mindful that a motion to disqualify is committed to the Court's discretion, that such motions are generally viewed with disfavor, and that a party seeking disqualification must meet a high standard of proof. *Marshall v. State of New York Division of State Police,* 952 F. Supp. 103, 106 (N.D.N.Y. 1997).

<u>Chadbourne's Isolation of Ms. Miller</u>

In October of 2008, when Chadbourne was first approached about the possibility of being retained by Fireman's Fund to defend against Utica Mutual's claims, the firm inquired of Ms. Miller about her prior work for Utica Mutual. She advised that she had "no recollection" of having "ever worked on any matter for Utica Mutual involving Goulds". Dkt. No. 44, Raim Aff., ¶ 3. Nevertheless, the leader of Chadbourne's insurance and reinsurance practice group

> made it clear to the Chadbourne attorneys working on the R&Q Re and FFIC matters, that Ms. Miller would not work on those matters, that she would have no discussions about those matters with Chadbourne attorneys involved with that matter, and that Ms. Miller was not to disclose to any Chadbourne personnel substantive information about her work at her prior firms concerning Utica Mutual.

*Id.*, at ¶ 6.

In January of 2010 a Hunton attorney by happenstance learned that Ms. Miller was working at Chadbourne. By letter dated February 2, 2010, Utica Mutual wrote to Ms. Miller, raising the conflict issue. Chadbourne responded by a letter to Hunton dated February 4, 2010, advising of the firm's inquiries of Ms. Miller in October of 2008 and the screening procedures that had been put in place. Utica Mutual replied by letter dated February 8, 2010, discussing in detail the memorandum of October 26, 2001, billing reports, and other material more fully discussed below. On February 12, 2010, Chadbourne issued an "Ethical Wall" memorandum to all personnel. *See*, e.g., Dkt. No. 44, Aldridge Aff., Ex. A.

4

In its motion Utica Mutual argues that Chadbourne's isolation of Ms. Miller was inadequate.

      1. Ms. Miller's Role

In considering whether Chadbourne's isolation of Ms. Miller was sufficient to overcome the presumption, a closer examination of Ms. Miller's role is appropriate. Ms. Miller graduated from law school in December of 1998, and began her legal employment in the Spring of 1999 at Chadbourne. She left Chadbourne in January, 2001, and in September, 2001, joined Shaw Pittman's insurance coverage practice group. That group was led by, among others, Walter J. Andrews, Esq., who was the principal attorney at Shaw Pittman responsible for the relationship between that firm and Utica Mutual. Mr. Andrews was also Ms. Miller's supervisor. In March, 2005, the majority of the insurance coverage practice group, including Ms. Miller and Mr. Andrews, left Shaw Pittman and joined Hunton in that firm's McLean, Virginia, office. At Hunton Mr. Andrews continued to be the principal attorney responsible for the representation of Utica Mutual, and he continued to be Ms. Miller's supervisor.

In the fall of 2005 Ms. Miller, for family reasons, relocated from Hunton's McLean, Virginia, office to the firm's Dallas, Texas, office. She worked there on a part time basis until May, 2006, when she went on maternity leave. It is unclear from the record as to whether Ms. Miller returned to Hunton following her maternity leave, but in any event she became employed by Chadbourne in August, 2006. She continues to be employed by Chadbourne, and since October, 2009, for personal and family reasons, has been working the equivalent of three days per week.

      (a) <u>The Memorandum of October 26, 2001</u>

Much of Utica Mutual's argument for disqualification is based upon a memorandum that Ms. Miller e-mailed to Bernard Turi on October 26, 2001, while she was employed at Shaw Pittman. At that point in time Mr. Turi was an Assistant Vice President for Utica Mutual and he held the positions

of Claims Attorney and Director of Liability. The copy of that memorandum that is part of the record before the Court has been heavily redacted, undoubtedly because it contains attorney-client communications, as is noted on the memorandum. The memorandum was authored by Len A. Berk, Paul Janaskie and Ms. Miller; Ms. Miller's name is listed third on the memorandum.

As of the date of this memorandum Ms. Miller had been associated with Shaw Pittman for less than two months. She spent a total of approximately 20 hours of general research and drafting in connection with the memorandum. In his affidavits Mr. Turi makes no claim that he or anyone else at Utica Mutual *ever* communicated with Ms. Miller about the memorandum. Similarly Mr. Andrews, who was Ms. Miller's supervisor and responsible for the Utica Mutual account, makes no claim that he or anyone else at Shaw Pittman communicated with her about the memorandum, or that she played any role in subsequent events concerning Utica Mutual's position on its disagreement with Goulds Pumps. This of course is consistent with Shaw Pittman's billing records, which indicate that Ms. Miller did not bill any further time to this matter after October 26, 2001.

Based upon the record the Court finds as entirely credible Ms. Miller's assertion, over eight years later, that she had no recollection of doing any of this work. The Court fully credits the statements at paragraphs 20 and 21 of Ms. Miller's affidavit of March 29, 2010. Dkt. No. 44, Miller Aff..

(b)  Other Reinsurance Disputes

By referencing heavily redacted billing reports, a cover letter, a memorandum, covering e-mails, and a Cook County, Illinois, Circuit Court pleading, Utica Mutual, as it did with the memorandum of October 26, 2001, tries to create the impression that Ms. Miller had an appreciable role in representing it in certain reinsurance disputes which have a substantial relationship to the instant litigation. First, the

6

record that Utica Mutual has created to support this impression is thin, at best. But far more importantly, Mr. Andrews, who presumably is fully familiar with Ms. Miller's role in these disputes, is silent, as is Mr. Turi. Surely if Ms. Miller had the appreciable role that Utica Mutual suggests, Mr. Andrews and Mr. Turi would have known of it.

(c) "Strategy Maker" or "Appreciable Role"

As the foregoing illustrates, and the Court finds, Ms. Miller clearly was not a "strategy maker" for Plaintiff while she was employed at Shaw Pittman and Hunton, nor did she have an "appreciable role" in representing Plaintiff. See *Human Electronics, Inc. v. Emerson Radio Corp.,* 375 F. Supp. 2d 102, 107 (N.D.N.Y. 2004) (if the nature of the work performed by the tainted attorney was such that the attorney was not a "strategy maker", the law firm may rebut the presumption of shared confidences); *Papyrus Technology Corp. v. New York Stock Exhchange, Inc.,* 325 F. Supp. 2d 270, 279 (S.D.N.Y. 2004) (if the tainted attorney "has played an 'appreciable role' in representing an adversary in the same matter", a Chinese Wall will fail to rebut the presumption). However, the Court is mindful that perhaps it should be hesitant "to attach importance to such labels" (*Intelli-Check, Inc. v. Tricom Card Technologies, Inc.,* No. 03-CV-3706 (DLI/ETB), 2008 WL 4682433, at *4), which are necessarily imprecise. Nevertheless, these findings weigh in Chadbourne's favor with respect to rebutting the presumption.

2. The Size of Ms. Miller's Group and Her Office Location

Plaintiff argues that the isolation of Ms. Miller is ineffective because of the small size of Chadbourne's insurance and reinsurance group (40 attorneys) and the fact that "at least two of the three attorneys involved in this case" work in Chadbourne's Washington, D.C., office, where Ms. Miller is located. Dkt. No. 42, at 16. In support of this argument Plaintiff relies upon several cases, and, on the

7

surface, language from these cases appears to support Plaintiff's argument.  But in deciding a disqualification motion a court must undertake a detailed analysis of the facts.  The facts of the instant case, concerning Ms. Miller, as set forth above, are so distinguishable from the facts underlying the cases relied upon by Utica Mutual that those cases have no applicability here.

For example, in *Cheng v. GAF Corporation,* 631 F. 2d 1052 (2d Cir. 1980), Mr. Cheng was represented by Legal Services for the Elderly Poor ("LSEP") in his employment discrimination action against GAF.  GAF was represented by the Epstein law firm, and while Mr. Cheng's lawsuit was in the discovery phase the Epstein law firm hired a senior attorney from LSEP.  It was undisputed that this senior attorney

> was personally introduced to Cheng; he "was present at and participated in several discussions with other LSEP attorneys and law students regarding the conduct, strategy, and facts of Mr. Cheng's case;" he discussed Cheng's communications with the representing attorney.

*Id.*, at 1057, ftn. 5.

Similarly, *Yaretsky v. Blum,* 525 F. Supp. 24 (S.D.N.Y. 1981), involved virtually the same cast as in *Cheng*, i.e., the Epstein firm representing the defendant, the same senior attorney from LSEP, and a plaintiff who was represented by LSEP.  The Court observed.

> In addition, the very extent to which Mr. Gassel [the tainted attorney] was involved in this case on the other side while at LSEP makes his screening virtually impossible at this stage.  For instance, a dispute broke out between plaintiffs and defendants concerning certain conversations which were alleged to have taken place between the parties.  At the request of plaintiffs' counsel, Mr. Gassel prepared an affidavit about a conversation he had with defendants' counsel while he was employed at LSEP.  Mr. Gassel prepared the affidavit with EBB&G's permission.  In the same vein, it is certainly not impossible that Mr. Gassel could be called as a witness should this matter result in further litigation.  Each of these situations has, or would, force contact between Mr. Gassel and EBB&G lawyers in the context of discussing this case.  Surely no "Chinese Wall" could survive such an assault.

*Id.*, at 30.

Plaintiff also cites to *United States Football League v. National Football Legaue,* 605 F. Supp. 1448 (S.D.N.Y. 1985), and quotes from that citation that "in cases of close contact, a Chinese Wall is bound to be ineffective". Dkt. No. 45, at 14. But there the Court concluded, based upon the unique facts of the case, that substantive contact with the tainted attorney "may be well-nigh inevitable". *Id.,* at 1467. Similarly, in *Hakimian Management Corp. v. Fiore,* 2007 N.Y. Slip Op. 51352 (Sup. Ct. N.Y. Co. 2007), a complex commercial matter was in dispute. The tainted lawyer had "extensive involvement in setting up the joint venture (the LLC), in the negotiations with the EDC, and the drafting of the contract of sale on behalf of all parties". Id., at *7. All of this was central to the dispute before the Court. Similarly, in *Decora Incorporated, v. DW Wallcovering, Inc.,* 899 F. Supp. 132 (S.D.N.Y. 1995), the tainted lawyer had "in fact worked on the case himself, being one of a few attorneys in the firm specializing in matters requiring chemical expertise". It was "undisputed that the senior lawyer in the case regularly works with [the tainted lawyer], relying on him for chemical expertise". *Id.,* at 140.

Finally, in *Kassis v. Teacher's Insurance and Annuity Association,* 93 N.Y. 2d 611 (1999), attorney Arnold was an associate at the firm that represented plaintiff Kassis. He "conducted five depositions of non-parties and co-plaintiff North River, attended two court-ordered mediation sessions as sole counsel for the client, appeared as Kassis' attorney at a physical examination of the subject building, and conversed with Kassis on a regular basis". *Id.,* at 614. He then became employed by the 26 person law firm that represented the defendant, while the litigation continued to proceed. The Court of Appeals determined that "[t]he erection of a 'Chinese Wall' *in this case*, therefore, was inconsequential". *Id.,* at 619 (emphasis added).

On the facts all of these cases are starkly in contrast to the instant case.

### 3. The Timing of the Isolation

Utica Mutual argues that Chadbourne's "Ethical Wall" memorandum, issued a year and a half after the firm began its representation of Fireman's Fund, was untimely. Here again Plaintiff cites to several cases containing language that, on the surface, appears to support its argument. But, as before, the facts of the instant case are so distinguishable from the facts underlying the cases relied upon by Plaintiff that those cases have not applicability here.

For example, in *Decora Incorporated,* 899 F. Supp. 132, the tainted attorney had actually worked on the case while at his new firm, representing the defendants against his former client, prior to the creation of a "Chinese Wall". In *F. Papanicolaou v. Chase Manhattan Bank, N.A.,* 720 F. Supp. 1080 (S.D.N.Y. 1989), the facts were particularly egregious. There "the partner at Millbank, Tweed, Hadley and McCloy who was in charge of the defense of this action discussed the merits of this case with the plaintiff for an hour and a half outside the presence of the plaintiff's counsel". *Id.*, at 1081. The Millbank partner passed along what he had learned from the plaintiff to four other Millbank attorneys who were involved in the case. It was after this that Millbank created a "Chinese Wall" around these five attorneys. Finally, in *Marshall v. State of New York Division of State Police,* 952 F. Supp. 103 (N.D.N.Y. 1997), attorney Greene

> sat in on a full-day confidential meeting at which the results of the State Police internal investigation were presented to executive staff at the top levels of State government. In addition, Greene was provided a copy of the confidential internal investigative report prepared by the Division of State Police in response to the allegations contained in the document forwarded by Attorney Moses. Greene even prepared a confidential report that evaluated and critiqued the NYSP's evidence.

*Id.,* at 108-109. Ms. Greene subsequently became affiliated with the plaintiff's law firm, the Ruberti Firm. "[T]he only action that the Ruberti Firm took, which can be construed as a screening procedure,

10

was to have Ms. Greene leave the firm on May 15, 1996, almost a year after she became affiliated with the Ruberti Firm". *Id.,* at 111.

In the instant case Ms. Miller's limited work on behalf of Utica Mutual occurred years before she joined Chadbourne. The Court fully credits her statements that she recalls virtually nothing about this limited work. (Indeed, the Court fully credits the statements at paragraphs 2, 15, 16, 18, 20, 21, 23, 25, 26, 28 and 29 of Ms. Miller's affidavit of March 29, 2010. Dkt. No. 44, Miller Aff.) Nevertheless, in October of 2008, when Chadbourne was first approached about being retained to defend against Utica Mutual's claims, a screen was immediately established. The pertinent Chadbourne attorneys have submitted affidavits, stating that the provisions of the October, 2008, screen have been followed. The "Ethical Wall" memorandum that Chadbourne issued in February, 2010, was not significantly different in substance than the initial screen.

In summary, based upon the facts before it, this Court is convinced that Chadbourne's isolation of Ms. Miller was and is adequate. Therefore the presumption of confidence sharing has been rebutted, and Plaintiff's motion to disqualify Chadbourne is denied [1].

Dated: January 4, 2011

George H. Lowe
United States Magistrate Judge

---

[1] In September, 2010, after the disqualification motion had been fully briefed, counsel provided certain submissions relevant to an action, *Utica Mutual Insurance Company v. INA Reinsurance Company,* pending in the Southern District of New York. Dkt. Nos. 47, 48 and 49. The Court and counsel discussed these submissions during a conference call on September 17, 2010. A further conference call will be scheduled for the near future. During that conference call Utica Mutual may again raise its concerns about the disclosure to Chadbourne of certain materials to which Ms. Miller had access.