UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UTICA MUTUAL INSURANCE COMPANY,

           Plaintiff-Counter Defendant,

    -v-                             6:09-CV-853
                                        (DNH/TWD)

FIREMAN'S FUND INSURANCE COMPANY,

           Defendant-Counter Claimant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                         OF COUNSEL:

HUNTON & WILLIAMS LLP         SYED S. AHMAD, ESQ.
Attorneys for Plaintiff            WALTER J. ANDREWS, ESQ.
   -Counter Defendant          PATRICK M. MCDERMOTT, ESQ.
1751 Pinnacle Drive
Suite 1700
McLean, VA 22102

SIDLEY AUSTIN LLP              DANIEL R. THIES, ESQ.
Attorneys for Plaintiff            THOMAS D. CUNNINGHAM, ESQ.
   -Counter Defendant          WILLIAM M. SNEED, ESQ.
One South Dearborn Street
Chicago, IL 60603

WILLIAMS LOPATTO PLLC        MARY A. LOPATTO, ESQ.
Attorneys for Defendant          JOHN B. WILLIAMS, ESQ.
   -Counter Claimant
1707 L Street NW, Suite 550
Washington, DC 20036

DAVID N. HURD
United States District Judge

# TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

III.    LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

        A.      Motion for Judgment on the Pleadings. . . . . . . . . . . . . . . . . . . . . . . .   7

        B.      Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

IV.     DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

        A.      Defendant FFIC's Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
                1.      Motion for Judgment on the Pleadings (to dismiss Counts II and III) . .   9
                        a.      Count II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
                        b.      Count III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
                2.      Motion for Partial Summary Judgment on Count I (Utica's "Aggregate
                        Limits" Contention) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
                3.      Motion for Partial Summary Judgment on Count II (Utica's "Bad Faith"
                        Contention) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
                4.      Motion for Summary Judgment on Count I (Utica's "Follow the
                        Settlement" Contention) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24
                5.      Motion in Limine to Preclude Testimony of Dennis R. Connolly. . . . . .   39

        B.      Plaintiff Utica's Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
                1.      Motion for Partial Summary Judgment on the Follow the Fortunes
                        Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
                2.      Motion for Partial Summary Judgment That FFIC Is Not Entitled To
                        Rescission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51
                3.      Motion for Partial Summary Judgment That Notice Was Not Due Before
                        February 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

# MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiff Utica Mutual Insurance Company ("Utica" or "plaintiff") commenced this diversity action against defendant Fireman's Fund Insurance Company ("FFIC" or "defendant") on July 29, 2009 seeking to enforce the terms of its reinsurance contracts.

Plaintiff seeks damages in the amount of nearly $29 million for amounts billed through August 31, 2009, interest, attorneys' fees, costs, and declaratory relief based on defendant's alleged breach of the reinsurance contracts and breach of the duty of good faith and fair dealing. FFIC counterclaims for rescission based on plaintiff's alleged intentional and/or negligent rescission. The case was referred to mandatory mediation, but did not settle.

After completing limited discovery, plaintiff moved on June 6, 2014 and June 13, 2014 for partial summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 dismissing two of defendant's affirmative defenses. Oral argument was heard on July 25, 2014 and a Memorandum-Decision and Order was issued on February 9, 2015, denying both motions. Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co., No. 6:09–CV–853, 2015 WL 521024 (N.D.N.Y. Feb. 9, 2015). With respect to FFIC's late notice defense, it was held that the parties may litigate lost commutations at trial, and if FFIC can establish resulting prejudice, it would be entitled to complete relief from its duty to indemnify. As to FFIC's bad faith defense, disputed issues of material fact remain as to whether Utica was grossly negligent or reckless in failing to provide prompt notice to FFIC and thus whether its claim for indemnification is barred.

Thereafter, plaintiff moved for partial summary judgment pursuant to Rule 56 on the follow the fortunes doctrine, defendant's counterclaims for rescission, and when notice to defendant was required. Defendant simultaneously moved for judgment on the pleadings pursuant to Rule 12(c) to dismiss Counts II and III, and for partial summary judgment pursuant to Rule 56 on plaintiff's aggregate limits, bad faith, and follow the settlement contentions. Plaintiff opposed defendant's motions, and defendant opposed plaintiff's motions. Both parties submitted replies in further support.

All seven pending motions were fully briefed and oral argument was heard on February 13, 2015, in Utica, New York. Decision was reserved. While pending, defendant filed a motion in limine pursuant to Federal Rule of Evidence 702 to preclude expert testimony at trial by Dennis R. Connolly. Plaintiff opposed. That motion will be considered on the basis of the submissions without oral argument.

## II. **BACKGROUND**[1]

The parties' familiarity with the facts and history of this case is presumed, and only those facts necessary for the disposition of the pending matters will be recited. This case involves a dispute over $35 million which Utica claims FFIC owes it under its reinsurance contracts.[2] FFIC argues it does not owe Utica any money because Utica breached provisions in the reinsurance contracts.

---

[1] The following facts, which are undisputed unless otherwise noted, are drawn from the statements of material facts filed by the parties in accordance with Local Rule 7.1(a)(3), each side's respective responses to those statements, and the relevant declarations and attached exhibits.

[2] As of July 2009 when Utica commenced this suit, it had billed FFIC for nearly $29 million in claims. By November 2009, it had submitted further bills totaling $35 million, the sum of each $5 million reinsurance contract for each of the seven years at issue.

Utica issued primary liability insurance policies to Goulds from 1966 through 1972.[3] These seven primary policies have not been located and one of the main issues in this case is whether those policies contained aggregate limits for bodily injury. Utica also issued umbrella policies to Goulds for these same years providing for $10 million in coverage each year. Utica reinsured the umbrella policies, reinsuring $5 million of each $10 million with FFIC[4] pursuant to facultative reinsurance contracts. Each of the facultative reinsurance contracts contain the following provision: "All claims involving this reinsurance, when settled by the Company [Utica], shall be binding on the Reinsurer [FFIC] . . . ." See LoPatto Decl., Ex. 2, ECF. No. 285 (the "Certificates"). This provision is known as a follow the settlements clause.[5] See Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp., 419 F.3d 181, 184 (2d Cir. 2005) "(Gerling").

Goulds became the subject of thousands of asbestos bodily injury claims, with the first suits naming Goulds in 1997. Pursuant to the primary policies between Goulds and Utica, Utica defended and indemnified Goulds for these claims. In mid-2001, Utica provided notice of the Goulds losses to reinsurers of its umbrella policies, including reinsurers at the $5 million excess of the $5 million umbrella layer. Utica contends this was an initial and precautionary notice. FFIC disputes this and suggests the reinsurers actually received earlier notice, but Utica has no record of such. According to Utica, FFIC

---

[3] Goulds purchased primary and umbrella coverage from Utica for decades before and after this, but only this time period is at issue in this case.

[4] Utica retained 5% of the first $1 million; $5 million was reinsured with FFIC; and the remainder reinsured with General Reinsurance Corporation ("Gen Re").

[5] The follow the settlement doctrine is sometimes referred to as the follow the fortunes doctrine and practitioners use the terms interchangeably. Follow the settlement "essentially describes the follow-the-fortunes doctrine in the settlement context." N. River Ins. Co. v. ACE Am. Reins. Co., 361 F.3d 134, 137 n.2 (2d Cir. 2004).

did not receive the precautionary notice at this time because Utica was unaware of the FFIC reinsurance and did not learn about it until 2008, when another reinsurer notified Utica about it. According to Utica, it had not retained all of its policy records from decades earlier, consistent with its document retention policies.

FFIC disputes this and contends that when Utica notified these reinsurers—those reinsuring umbrella policies post-1972—is irrelevant to when Utica determined or should have determined there was a reasonable possibility that the 1966-72 umbrella policies would be involved. FFIC maintains that Utica's sharing information on the Goulds claims in 1996 with Gen Re indicated that Utica recognized then that the claims *could* penetrate the 1996-72 umbrella policies. However, Utica contends that Gen Re only learned of the Goulds claims in the 1990s through its routine review of Utica's asbestos and environmental files. Utica asserts that it provided precautionary notice of the claims to the other reinsurers of its umbrella policies in June 2001, and that it would have included a notice to FFIC if Utica had known about FFIC's reinsurance at the time.

Declaratory judgment actions between Goulds and its insurers, including Utica, followed in 2003 to determine the rights of the insurers. Goulds and Utica engaged in mediation relating to the coverage. According to FFIC, Utica made it non-negotiable that Goulds agree that all Utica primary policies had aggregate limits of coverage, even those policies which were not at issue in the coverage litigation. According to FFIC, in exchange for Goulds' receipt of a $325 million settlement from Utica, Goulds agreed to stipulate that all of the Utica primary policies had aggregate limits for bodily injury of $300,000 and that all such limits had been exhausted. The agreement, signed in February 2007 by Utica and Goulds, also provided that the $325 million settlement would

come from the umbrella policies (therefore triggering Utica's reinsurance policies).  See LoPatto Decl., Ex. 6, ECF. No. 285 (the "Settlement Agreement").

According to Utica, by 2007, payments on Goulds claims had reached FFIC's layer on the umbrella policies at issue and after learning about FFIC's reinsurance in 2008, Utica notified FFIC in July 2008.  FFIC asserts that Utica provided no rationale for reporting its reinsurance claim more than a year after its February 2007 settlement with Goulds.  According to the Certificates, "[p]rompt notice shall by given to the Reinsurer . . . of any occurrence or accident which appears likely to involve this reinsurance."  See generally Certificates.  Utica submitted reinsurance claims in August, September, October, and November 2009, totaling $35 million.  Under the Certificates, Utica was required to "make available for inspection and place at the disposal of [FFIC] at reasonable times any of its records relating to this reinsurance or claims in connection therewith."  Id.

Following Utica's requests for payment, FFIC initiated a claims investigation.  FFIC sought numerous pieces of information from Utica, inspected its files, and sent a team to Utica's offices for inspection.  While its claims investigation was ongoing, Utica filed this suit contending that FFIC was taking too long to pay and was, inter alia, in breach of the Certificates.

## III.  LEGAL STANDARDS

### A.  Motion for Judgment on the Pleadings

The standard for granting a Rule 12(c) judgment on the pleadings is identical to that of a Rule 12(b)(6) motion to dismiss.  Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001).  To survive a Rule 12(b)(6) motion to dismiss, the "[f]actual

allegations must be enough to raise a right to relief above the speculative level." Bell Atl.

Corp. v. Twombly, 550 U .S. 544, 555 (2007).  Although a complaint need only contain "a

short and plain statement of the claim showing that the pleader is entitled to relief," FED. R.

CIV. P. 8(a)(2), more than mere conclusions are required.  Indeed, "[w]hile legal conclusions

can provide the framework of a complaint, they must be supported by factual allegations."

Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  Dismissal is appropriate only where plaintiff has

failed to provide some basis for the allegations that support the elements of its claims.  See

Twombly, 550 U.S. at 570 (requiring "only enough facts to state a claim to relief that is

plausible on its face").  When considering a motion to dismiss, the complaint is to be

construed liberally, and all reasonable inferences must be drawn in the plaintiff's favor.

Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

### B.  Motion for Summary Judgment

The entry of summary judgment is warranted when "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED.

R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  A fact

is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the

governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of N.Y., 426 F.3d 549,

553 (2d Cir. 2005).  A material fact is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of

demonstrating that there is no genuine issue of material fact to be decided with respect to

any essential element of the claim.  Id. at 250 n.4.  The failure to meet this burden warrants denial of the motion.  See id.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Id.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the non-moving party. Jeffreys, 426 F.3d at 553.  Summary judgment is inappropriate where "a review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## IV.  **DISCUSSION**

### A.  **Defendant FFIC's Motions**

#### 1.  **Motion for Judgment on the Pleadings (to dismiss Counts II and III)** (ECF No. 276)

FFIC moves for judgment on the pleadings to dismiss Counts II and III as duplicative of Count I.  In Count I, Utica complains that FFIC breached the Certificates by not paying its claims and seeks damages in the form of the sums due under the Certificates through August 31, 2009.  In Count II, Utica alleges that FFIC asked for irrelevant information and ignored its billings, inquiries, and repeated requests for payment, thereby violating FFIC's duty to deal with Utica in utmost good faith.  For damages under Count II, Utica seeks attorneys' fees and other costs in connection with this lawsuit.  In Count III, Utica seeks a declaration that FFIC is obligated to pay for bills after August 31, 2009, pursuant to the Certificates.

Defendant contends Counts II and III are duplicative of Count I and are not independent causes of action. It argues Counts II and III are premised on the same alleged breach of its duties under the Certificates—its failure to pay—and seek relief for that breach.

Utica responds that Count II is not duplicative as nowhere in Count I is it alleged that FFIC ignored information in its claim investigation, requested additional improper information, and ignored Utica's inquiries. Further, Count II seeks attorneys' fees and other costs in connection with this lawsuit, a different remedy than Count I. Similarly, Utica argues Count III is different than Count I as the declaratory judgment cause of action recognizes that future obligations may arise under the Certificates, in addition to the amounts already billed and unpaid. Specifically, that the Certificates continue to apply to Utica's umbrella coverage to Goulds, and the parties continue to dispute how those Certificates apply.

### a. Count II

The test for duplication respecting a breach of contract claim and a bad faith claim is whether "the [alleged] wrongful conduct was 'also the predicate for a claim for breach of covenant of an express provision of the underlying contract.'" Haym Salomon Home for the Aged, LLC v. HSB Group, Inc., No. 06–CV–3266, 2010 W L 301991, at *6 (E.D.N.Y. Jan. 20, 2010).

Count I seeks relief for FFIC's failure to pay amounts billed under the Certificates. Count II seeks relief for FFIC's alleged improper claims handling; that cause of action includes allegations that FFIC ignored information provided by Utica, asked for additional irrelevant information not needed to process Utica's billings, and improperly ignored Utica's

numerous inquiries regarding its review of Utica's billings and payment status. Utica alleges FFIC's bad faith in its claims processing caused it damages beyond the recovery of amounts owed under the Certificates, the relief sought in <u>Count I</u>. Thus <u>Count II</u> seeks attorneys' fees and other costs in connection with this lawsuit and all resulting damages from the breach of the duty of utmost good faith and fair dealing.

Because these causes of actions are predicated on different wrongful conduct and seek different relief, they may stand as separate causes of action. <u>See e.g.</u>, <u>Ret. Bd. of Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon</u>, No. 11 Civ. 5459, 2014 WL 3858469, at *3 (S.D.N.Y. July 30, 2014) (finding breach of good faith claim was not duplicative of breach of contract claim because they rested upon different facts); <u>Friedman v. Maspeth Fed. Loan & Sav. Ass'n</u>, No. 13-CV-6295, 2014 WL 3473407, at *9 (E.D.N.Y. July 14, 2014) (finding breach of good faith claim was not duplicative of breach of contract claim where the facts supporting each claim were not identical); <u>O.K. Petroleum Distrib. Corp. v. Travelers Indem. Co.</u>, No. 09 Civ. 10273, 2010 WL 2813804, at *4 (S.D.N.Y. July 15, 2010) (finding bad faith allegations that insurer inadequately investigated and inordinately delayed were not duplicative because they extended beyond a breach of insurance contract claim); <u>JJM Sunrise Auto., LLC v. Volkswagen Grp. of Am., Inc.</u>, No. 601658-14, 2014 WL 5800301, at *13 (N.Y. Sup. Ct. Nov. 6, 2014) (finding breach of good faith claim was not duplicative of breach of contract claim because breach of good faith claim contained allegations of wrongful conduct that were not alleged in breach of contact claim).

### b. **Count III**

The Declaratory Judgment Act, 28 U.S.C. § 2201(a), vests district courts with "broad discretion" to decline jurisdiction over requests for declaratory relief, <u>Dow Jones & Co., Inc. v.</u>

Harrods Ltd., 346 F.3d 357, 359 (2d Cir. 2003) (identifying factors relevant to exercise of such discretion, including, inter alia, "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved"; "whether a judgment would finalize the controversy and offer relief from uncertainty"; and "whether the proposed remedy is being used merely for procedural fencing, or a race to res judicata'" (internal quotation marks omitted)). Fort v. Am. Fed. of State, Cnty. and Mun. Emps., 375 F. App'x 109, 112 (2d Cir. Apr. 29, 2010) (summary order).

In Count III, Utica seeks a declaration of the same rights that will be determined under Count I for breach of contract. Count I alleges that as a result of the breach of the Certificates, FFIC owes Utica for billings through August 31, 2009, totaling nearly $29 million and that such damages are continuing. The parties do not dispute that future obligations may arise under the Certificates at issue, in addition to the amounts billed and unpaid as of the filing of the Amended Complaint. Count III seeks payment for billings subsequent to August 31, 2009. The declaratory judgment sought in Count III will not clarify or settle the legal issues involved in this case. The declaration sought, that FFIC breached the Certificates and that FFIC is obligated to make payment to Utica for subsequent billings, will be addressed in Count I, the breach of contract claim. Nor will a declaratory judgment offer relief from uncertainty because resolution of the breach of contract claim will offer that relief. Therefore, Count III is duplicative of Count I and it is proper to decline jurisdiction over plaintiff's request for declaratory relief in Count III.

FFIC's motion for judgment on the pleadings dismissing Counts II and III as duplicative of Count I will be granted in part and denied in part and Count III will be dismissed.

**2. Motion for Partial Summary Judgment on Count I (Utica's "Aggregate Limits" Contention)** (ECF No. 279)

FFIC moves for partial summary judgment on Count I, arguing it was not obligated to provide reinsurance coverage to Utica with respect to the five years 1966, 1968, 1969, 1970, and 1971.[6] It contends that because it was not obligated to provide reinsurance coverage for those years, it could not breach the Certificates for those years as a matter of law.

As explained in the previous Memorandum-Decision and Order, one of the main issues in this case involves the existence of aggregate limits for bodily injury in the primary policies between Goulds and Utica. Aggregate limits for bodily injury in the primary policies would allow Utica to combine asbestos injuries arising from multiple accidents, occurrences, or individuals into a loss that would exceed the primary policy limits, penetrate the umbrella policy, and access FFIC's reinsurance. Utica claims that these policies did in fact have aggregate limits, while FFIC contends they did not. If these missing primary policies had said aggregate limits, the umbrella policies between Goulds and Utica could and would have been accessed, thereby triggering the reinsurance policies between Utica and FFIC. Alternatively, if the primary policies did not contain aggregate limits, the umbrella policies would never have been triggered, and FFIC's reinsurance coverage would not have been reached. It follows that FFIC would have no liability to Utica for the five years in question. As the primary policies in question are missing, much of the discovery in this case has focused on whether those policies had aggregate limits for bodily injury.

The instant motion for partial summary judgment is about different aggregate limits—those listed in the umbrella policies. According to FFIC, the contractual reinsurance

_____

[6] Again, Utica could not locate the primary policies for these years.

relationship between Utica and FFIC is governed by (1) the annual (reinsurance) Certificate, and (2) the corresponding umbrella policy. It is undisputed that the Certificates contain a follow form provision, providing that FFIC's liability is subject to the terms and conditions of Utica's contract with Goulds (the umbrella policy). FFIC agreed to provide reinsurance only in accordance with the terms and conditions of the umbrella policies and therefore what those policies said about the limits of the underlying primary policies. While the primary policies between Goulds and Utica for the years at issue are missing, the parties are in possession of the umbrella policies between Goulds and Utica for those years.

FFIC argues the umbrella policies are clear and unambiguous, and none contain aggregate limits for bodily injury for the underlying primary policies. FFIC has submitted the declarations page of each umbrella policy. LoPatto Decl., Ex. 2, ECF. No. 279-5 (the "Umbrella Declarations pages").[7] Each Umbrella Declarations page includes a "Schedule of Underlying Insurance Policies." According to FFIC, these pages provide the bodily injury and property damage claim limits for the corresponding underlying primary policies. Each Umbrella Declarations page submitted by FFIC includes an aggregate limit for property damage, but no aggregate limit is listed for bodily injury. FFIC asserts this shows Utica knew how to provide for an aggregate limit when it wanted to—if the primary policies had aggregate limits for bodily injury, they would have appeared on the Umbrella Declarations page of the corresponding umbrella policy.

According to FFIC, because the Umbrella Declarations pages (which the Certificates follow form to) list no aggregate limits for bodily injury and because the contracts are clear

_____

[7] No policy parts other than these pages have been found for the 1966 and 1968-71 umbrella policies Utica issued to Goulds.

- 14 -

and unambiguous, they may not be altered by extrinsic evidence. Therefore, FFIC contends that without aggregate limits for bodily injury in the primary policies, the Goulds claims never moved out of the primary policies, the umbrella policies never triggered, and Utica never should have paid under the umbrella policies. It follows that FFIC's reinsurance should never have been triggered and it cannot be obligated to provide reinsurance coverage for these five years and thus could not breach the Certificates as a matter of law.

Utica argues partial summary judgment should be denied because FFIC cannot prove by way of the umbrella policies that the missing primary policies lack aggregate limits for bodily injury. Further, even if it could, the umbrella policies as presented do not actually establish that the underlying primary policies lack aggregate limits for bodily injury. Utica takes issue with FFIC's theory about how the umbrella coverage applies over the primary policies because FFIC does not discuss nor attach any triggering language from the umbrella policies. Instead, FFIC's entire argument is based on how the umbrella policies *might* apply in light of the Umbrella Declarations pages, but fails to provide any supporting umbrella policy contract language such as the insuring agreements, exclusions, definitions, endorsements, or terms and conditions. According to Utica, there is not a complete contract to be interpreted: application of the Certificates requires an understanding of both the primary and umbrella policies and the umbrella policies include terms and conditions explaining how the Umbrella Declarations pages apply but FFIC has not provided these.[8] Each umbrella policy

---

[8] Utica has included language from what it claims are the Insuring Agreements from the 1966 and 1968-71 umbrella policies. It asserts that the language explains how an occurrence can trigger coverage under the umbrella policy, and that nothing in the language requires that the aggregate limit be set forth in the Schedule of Underlying Insurance (Umbrella Declarations page) as FFIC argues. See Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Part. Summ. J. on Count I, ECF No. 309, at 4-5. FFIC contends there is no proof that the submitted forms were actually part of the umbrella policies at issue.

generally includes a declarations page, pre-printed policy terms and conditions called the "policy jacket," and any endorsements. See Pl.'s Stmt. Addt'l Mat. Facts & Resp. to Def.'s Stmt. of Mat. Facts in Supp. of Mot. for Part. Summ. J. on Count I, ECF No. 303, ¶ 1 ("Pl.'s Resp. SMF Count I").

Utica also argues that the Umbrella Declarations pages FFIC relies upon lack clarity; for example the 1971 page which, according to FFIC, shows no aggregate limit for bodily injury products coverage. See Umbrella Declarations pages. However, Utica alleges such a reading ignores the headings "Each Person" and "Aggregate" which appear to be applicable to the products coverage entry only, with "300 agg" appearing in the aggregate column. Utica insists that FFIC reads in additional language to assume that the aggregate column applies only to property damage coverage. Because the contracts as presented are incomplete, unclear, and ambiguous on their face, Utica urges extrinsic evidence should be permitted. According to Utica, the current missing parts of the Certificates and the umbrella policies contradict FFIC's assumption that the primary policies lack aggregate limits for bodily injury.

FFIC's motion for partial summary judgment is based on incomplete contracts. While FFIC argues that extrinsic evidence should not be permitted, this presupposes a complete contract, which is not at hand. The rules governing contract interpretation, including the legal determination of ambiguity and the consideration of extrinsic evidence, presuppose a complete contract. See e.g., Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002). When determining whether a contract is ambiguous, a court reviews the contract "as a whole to determine its purpose and intent." W.W.W. Assoc. v. Giancontieri, 77 N.Y.2d 157, 162-63 (1990); see also Sayers v. Rochester Tele. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d

1091, 1095 (2d Cir. 1993) (explaining court must examine the entire contract, in order to "safeguard against adopting an interpretation that would render any individual provision superfluous").

The contracts forming the basis of this motion are incomplete for two reasons; the Certificates are not integrated agreements and the umbrella policies have not been submitted in full. The Certificates are not integrated agreements because their application requires an understanding of the umbrella policies and primary policies. See, e.g., Travelers Cas. & Sur. Co. v. ACE Am. Reins. Co., 392 F. Supp. 2d 659, 664 (S.D.N.Y. 2005), aff'd, 201 F. App'x 40 (2d Cir. 2006) (summary order). The umbrella policies are similarly incomplete because only the Umbrella Declarations pages have been submitted; the policies include terms and conditions which explain how the Umbrella Declarations pages apply, but those terms and conditions have not been provided by FFIC. To consider the declarations page of an insurance policy in isolation from the remainder of the contract would be to consider an incomplete contract.

Finally, FFIC's assumption, without authority, that the absence alone of an aggregate limit in the declarations pages means that the primary policies lack aggregate limits is unpersuasive. As a California trial court in a related coverage action found in an analogous argument regarding the absence or presence of aggregate limits in the subject primary policies, "leaving a space blank is not clearly and unambiguously the same as typing '0' or 'No Aggregate Limit' in the space." See Pl.'s Resp. SMF Count I, ¶ 3. Because the contracts required to resolve this issue are incomplete and not fully provided, a determination as a matter of law cannot be made at this time and FFIC is not entitled to partial summary judgment on this issue.

Accordingly, FFIC's motion for partial summary judgment on Count I of the Amended Complaint as to its obligation to provide reinsurance coverage to Utica with respect to the five years 1966, and 1968-71 will be denied.

### 3. **Motion for Partial Summary Judgment on Count II (Utica's "Bad Faith" Contention)** (ECF No. 275) (286 sealed)

FFIC moves for partial summary judgment dismissing Count II alleging a breach of the duty of utmost good faith for which Utica seeks attorneys' fees and other costs in connection with this lawsuit, including lost internal resources and lost investment income. Count II alleges FFIC acted in bad faith by failing to pay Utica's reinsurance claim. FFIC argues this count must be dismissed because the fact that it did not pay Utica's belatedly filed claim does not come close to the standard for establishing bad faith; it had a sufficient basis to question Utica's claims and other reasonable carriers would have, and did do the same.

Utica opposes and argues the motion should be denied because FFIC's compliance with its duty of utmost good faith is in dispute and should go to a jury. Utica also contends that in addition to payment delay or refusal, misconduct in a claims investigation can lead to bad faith liability in New York and there is evidence FFIC mishandled the claims investigation.

"As in all contracts, implicit in contracts of insurance is a covenant of good faith and fair dealing, such that 'a reasonable insured would understand that the insurer promises to investigate in good faith and pay covered claims.'" Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y., 10 N.Y.3d 187, 194 (2008); (quoting N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318 (1995)). However, "an insurer is not liable in excess of the policy limits for the breach of an insurance contract absent bad faith." In re AXIS Reins. Co. REFCO Related Ins. Litig.,

No. 07-CV-07924, 2010 WL 1375712, at *5 (S.D.N.Y. Mar. 7, 2010). Moreover, New York generally does not recognize a separate cause of action for damages based on the denial of insurance coverage when a breach of contract claim is also asserted. See e.g., Haym Salomon Home for the Aged, LLC, 2010 WL 301991, at *5.

However, the New York Court of Appeals in Sukup v. State, 19 N.Y.2d 519 (1967) established that there is a cause of action for extra-contractual damages where an insurer refuses, in bad faith, to pay a claim of its own insured. To prevail on such a claim and "impose an extra-contractual liability for legal expenses," "more than an arguable difference of opinion between carrier and insured over coverage" is required. Id. at 522. "It would require a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be able to assert it." Id. In Sukup, the Court found the plaintiff did not demonstrate that the insurer denied his worker's compensation coverage in bad faith.

Several courts since Sukup have acknowledged a cause of action for extra-contractual damages for a bad faith denial of coverage, but have generally found that the plaintiff was unable to meet the high standard to prevail on such a claim. See Ebrahimian v. Nationwide Mut. Fire Ins. Co., 960 F. Supp. 2d 405, 416 (E.D.N.Y. 2013) (collecting cases). In Liberty Surplus Ins. Corp. v. The Segal Co., 420 F.3d 65, 70 (2nd Cir. 2005) (per curiam), the United States Court of Appeals for the Second Circuit acknowledged that an insured could recover the costs of litigation, including attorneys' fees. It proceeded to affirm dismissal of the defendant's counterclaim because the defendant did not allege that its claim was denied in bad faith and furthermore, "the dispute reflect[ed] an arguable difference of opinion rather than bad faith by the insurer." Id. (internal quotation marks omitted).

In Greenburgh Eleven Union Free School District v. National Union Fire Ins. Co. of Pittsburgh, 304 A.D.2d 334 (N.Y. App. Div. 1st Dep't 2003), the New York Appellate Division First Department relied on Sukup in affirming the lower court's decision that the plaintiff was not entitled to extra-contractual damages of attorneys' fees since both parties "had an arguable basis for their respective disclaimers." Id. at 336-37. A few months later in Wurm v. Commercial Ins. Co. of Newark, 308 A.D.2d 324 (N.Y. App. Div. 1st Dep't 2003), the First Department again cited Sukup in declining to award attorneys' fees to a plaintiff. Even viewing the facts in the light most favorable to that plaintiff, that Court could not conclude that the insurer "had no arguable basis for discontinuing plaintiff's benefits." Id. at 329. It affirmed the jury's finding that the insurer breached the policy, but found the plaintiff failed to make the required "'showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it.'" Id. at 330 (quoting Sukup, 19 N.Y.2d at 522).

The New York Court of Appeals again spoke on the issue in Bi–Economy Market, 10 N.Y.3d at 187. The Court held that "in light of the nature and purpose of the insurance contract at issue, as well as Bi-Economy's allegations that Harleysville breached its duty to act in good faith," the plaintiff was permitted to pursue a claim for extra-contractual consequential damages—specifically, the damages for ongoing business interruption as they were reasonably contemplated by the parties prior to contracting. Id. at 196. More recently, the Eastern District of New York in Ebrahimianhe relied on Sukup to find that the plaintiffs did not sufficiently allege they suffered any damages as a result of the "[d]efendant's alleged bad faith refusal to pay their claims other than the damages associated with the alleged breach of

the Policy," concluding that general disapproval is insufficient to state a claim for bad faith disclaimer of insurance coverage.  <u>Ebrahimianhe</u>, 960 F. Supp. 2d at 416-17.

For Utica to recover attorneys' fees and other costs, including lost internal resources and lost investment income, it must show that FFIC had no arguable basis to challenge its claim and further show that no reasonable carrier would, under the given facts, challenge the claim—in other words that the challenge was more than a difference of opinion.  The undisputed facts are that FFIC received notice of Utica's reinsurance claim in July 2008, well over a year after Utica settled with Goulds in February 2007.[9]  Utica's first bill to FFIC for $5 million was received on September 22, 2008 and included a two-page claim summary and chart of the number of claims by state.  Utica was required to provide proof of loss to FFIC per the Certificates, and even construing the two-page claim summary as such, FFIC was permitted to conduct its own investigation and evaluate a possible late notice defense among its other coverage positions.  During its investigation, FFIC learned that the primary policies for the years at issue were missing and that there was a question as to whether those policies contained aggregate limits.

Between September 22, 2008, and January 9, 2009, Utica and its broker followed up with FFIC in an attempt to prompt it to take action on the pending claims.  Pl.'s Resp. to Def.'s Stmt. of Mat. Facts in Supp. of Mot. for Partial Summ. J. on Count II, ECF No. 309-9, ¶ 3 ("Pl.'s Resp. SMF Count II").  On December 1, 2008, the broker wrote to Utica that "I have called [FFIC's representative] numerous times and either have gotten his voicemail, with no return call, or spoke to an individual in his office who informed me he was in a

_____

[9]  The parties dispute when notice was actually due, hence Utica's separate motion for partial summary judgment on the issue.

meeting." Id. During this time, the only information transmitted from Utica to FFIC had been the two-page claim summary and a chart of the number of claims by state. According to FFIC, this was insufficient information on which to pay the claim.

FFIC did not provide a substantive response or formally acknowledge Utica's bill until January 9, 2009.[10] On that date, FFIC requested an extensive list of information from Utica and an opportunity to review Utica's files in person. Utica responded on February 9, 2009, and provided all of the information FFIC requested that was available to it, including copies of previous notices that Utica sent to reinsurers.

FFIC sent an inspection team to three of Utica's offices in April 2009. Utica made available for FFIC's review its California and New York litigation files, the Goulds claim database, documents relating to the Settlement Agreement between Utica and Goulds, and communications between Utica and its counsel, including analyses as to coverage for claims under Utica's policies. FFIC contends that some of the documents it discovered during its investigation were inconsistent with Utica's assertions and stipulations in the Settlement Agreement that all of the primary policies had aggregate limits for bodily injury. According to FFIC, this raised serious questions as to its obligation to pay under the Certificates. Utica disputes that any documents were inconsistent.

Following the inspection, Utica provided additional information to FFIC on May 4, 2009 and July 24, 2009. FFIC continued to request evidence of the aggregate limits for bodily injury in the missing policies as well as other information, including asking on July 30, 2009 for copies of Utica policies issued to insured other than Goulds which allegedly showed that

---

[10] Utica also claims that at some point between when Utica submitted its billing to FFIC and when it sued, a FFIC representative told Utica that it would get its money faster if it sued. FFIC denies this allegation.

Utica *had* issued general liability policies without bodily injury aggregate limits.  On July 29, 2009, Utica filed the Complaint in this action contending FFIC was taking too long to pay.[11]

Even drawing inferences from the facts in a light most favorable to Utica, the non-movant—that FFIC's belated or even non-responses to Utica's inquires, FFIC's repeated requests for documents which Utica contends it did not need because it had been previously provided the information, and FFIC's on site inspection, over the time period of September 22, 2008 to July 29, 2009 while conducting an investigation into a potential $35 million plus claim involving missing primary liability policies for which there was *at minimum* a possibility those policies lacked aggregate limits for bodily injury, constituted delay tactics—this evidence does not come close to satisfying the high standard for sustaining a bad faith claim.

Instead, the undisputed evidence demonstrates that FFIC had legitimate grounds for investigating and not yet paying Utica's claim by July 2009.  Given when FFIC was notified by Utica compared to other similarly situated reinsurers, how long Utica waited to notify FFIC after settling with Goulds (over a year), and the missing primary policies for which there was at least a question regarding aggregate limits for bodily injury, it was reasonable for FFIC to conduct a thorough investigation.  That Utica did not receive payment under the Certificates as quickly as it would have preferred does not render FFIC dilatory in its investigation.  Notably, Utica is responsibly for a greater delay in this process:  more time elapsed between when it settled with Goulds (February 2007) and provided notice to FFIC of its reinsurance claim (July 2008) than between when it provided notice to FFIC (July 2008) and when, according to Utica, FFIC should have been prepared to render a resolution on its claims but

---

[11]  Service was not made on FFIC until September 23, 2009.

had not yet done so and thus commenced this suit (July 2009). Thus, even drawing all inferences in favor of Utica, there are no material facts in dispute that would preclude summary judgment. Utica cannot sustain its burden in opposition to summary judgment because it cannot show that FFIC had no arguable basis to challenge its claim nor can it prove that no reasonable carrier would, under the given facts, challenge the claim.

Therefore, FFIC's motion for partial summary judgment dismissing Utica's bad faith damages claim will be granted and Count II of the Amended Complaint will be dismissed.

### 4. Motion for Summary Judgment on Count I (Utica's "Follow the Settlement" Contention) (ECF No. 277) (285 sealed)

FFIC moves for summary judgment declaring that the settlement between Utica and Goulds was unreasonable and improperly designed to access and maximize Utica's reinsurance with FFIC and Utica is therefore not entitled to the protections of the follow the settlement, or follow the fortunes doctrine. Specifically, FFIC contends that Utica inserted two provisions in the Settlement Agreement with Goulds that rendered the settlement in bad faith and unreasonable: (1) that there were aggregate limits in the primary policies, and (2) that Utica's payment of the settlement amount was to be borne by the umbrella policies between Utica and Goulds, which were reinsured. In doing so, FFIC contends that Utica put its own interests as the cedent above FFIC's interests as the reinsurer. According to FFIC, it should therefore be relieved of its duty to indemnify Utica and as such, it did not breach the Certificates by failing to pay and Count I of the Amended Complaint should be dismissed.

Utica opposes and seeks a favorable summary disposition of its own on the follow the settlement contention, arguing that FFIC misstates the law, and any alleged motivation to increase reinsurance recoveries is irrelevant. It contends its settlement with Goulds was

reasonable and justified by multiple non-reinsurance related reasons and FFIC has put forth no evidence to demonstrate the settlement was unreasonable.

Count I is based on the assertion that FFIC is required to follow the settlement Utica entered into with its insured, Goulds. "Under the follow-the-settlements doctrine, a reinsurer must 'accept the cedent's good faith decisions on all things concerning the underlying insurance terms and claims against the underlying insured: coverage, tactics, lawsuits, compromise, resistance or capitulation,' as well as settlements and settlement allocation." Utica Mut. Ins. Co. v. Clearwater Ins. Co., No. 613-CV-1178, 2016 WL 254770, *at 4 (N.D.N.Y. Jan. 20, 2016) (Sharpe, S.J.) ("Clearwater"), app. dismissed, July 13, 2016 (quoting N. River Ins. Co. v. Ace Am. Reins. Co., 361 F.3d 134, 139-40 (2d Cir. 2004)). The follow the settlement doctrine serves to promote the "long established" goals of "maximum coverage and settlement" and to avoid "a proliferation of litigation" between the cedent and the reinsurer. Clearwater, 2016 WL 254770, at *4 (quoting N. River Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1205-06 (3d Cir. 1995) ("CIGNA")). As long as the cedent settles in good faith, reasonably, and within the applicable policies, the reinsurer is bound by the settlement and cannot relitigate the underlying coverage issues. Clearwater, 2016 WL 254770, at *4.

Generally, "good faith requires the reinsured to align its interests with those of the reinsurer." CIGNA, 52 F.3d at 1216. However, these interests need not be "perfectly aligned to trigger a follow-the-settlements clause." Gerling, 419 F.3d at 190 (internal quotation marks omitted). "'The reinsurer bears the burden to prove the cedent's bad faith and must present an extraordinary showing of a disingenuous or dishonest failure.'" Clearwater, 2016 WL 254770, at *4 (quoting Gerling, 419 F.3d at 191) (internal quotation marks omitted). To prove

bad faith, the reinsurer must demonstrate that the cedent acted, at a minimum, with gross negligence or recklessness.  Id.

Deference to the follow the settlement doctrine also requires that the cedent reasonably settle.  See Gerling, 419 F.3d at 194.  "[O]bjective reasonableness should ordinarily determine the validity of a [settlement] allocation."  U.S. Fidelity & Guar. Co. v. Am. Re-Ins. Co., 20 N.Y.3d 407, 420 (2013) ("USF&G").  In USF&G, the New York Court of Appeals recognized that "[r]easonableness does not imply disregard of a cedent's own interests" as "[c]edents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own."  Id.  Accordingly, a settlement allocation is reasonable if the cedent and the insured could have arrived at the allocation without the possibility of reinsurance recovery.  See id.

First, the parties dispute the applicability of two relatively recent decisions:  the Clearwater decision decided at the beginning of 2016 in this District, and Goulds Pumps, Inc. v. Travelers Casualty and Surety Co., B255439, 2016 WL 3564244, at *1 (Cal. Ct. App. June 22, 2016) (unpublished decision) ("Travelers") decided by a California appellate court.  Utica has submitted supplemental briefing urging that both decisions bolster its position and undermine FFIC's, while FFIC submitting briefing contending the decisions are factually distinguishable and should not affect this case.  While the decisions illuminate disputes similar to those in this case, as well as present helpful background information and standards of law, neither case is ultimately persuasive because the evidentiary records are not even remotely the same as the instant matter.

In Clearwater, cedent Utica pursued similar breach of contract litigation against its reinsurer Clearwater stemming from the same Utica-Goulds settlement involved here.  Senior

United States District Judge Gary Sharpe held that Clearwater was bound by the follow the settlement doctrine because it did not produce any evidence that Utica's settlement with Goulds was made in bad faith, and failed to raise any triable issue of fact that Utica acted unreasonably in its settlement decision to stipulate that the primary policies involved contained an aggregate limit. Clearwater, 2016 WL 254770, at *4-5. While the Clearwater decision is certainly persuasive, it is factually distinguishable. That case involved the policy years 1978-81, the primary policies were a part of that record, and some of those primary policies lacked an explicit aggregate limit. Judge Sharpe found that the lack of explicit aggregate limits rendered the policies ambiguous, and in light of the ample extrinsic evidence (submitted only by Utica) suggesting that all policies were intended to have aggregate limits, found Utica's resolution of that ambiguity to be reasonable. By contrast, this case involves the policy years 1966-72 and the primary policies are missing. The entire dispute in this case surrounding whether those primary policies contained aggregate limits for bodily injury is *because* they are missing—not because the section is blank, contains a zero, or is ambiguous.

In addition to the factual differences already noted, the Clearwater Court's finding that it was reasonable for Utica to conclude that the primary policies had aggregate limits of $500,000 was based on a different evidentiary record and different extrinsic evidence than that presented here. Significantly, the defendant in that case elected to submit absolutely no extrinsic evidence. FFIC also contends that discovery was limited in that case, and urges that the record contained none of the significant admissions, concessions, and witness credibility issues that have been developed in this case.

In Travelers, a California appellate court recently affirmed the judgment of the Superior Court of Los Angeles County finding that the primary policies Utica issued to Goulds in the years 1977-82 had aggregate limits. 2016 WL 3564244, at *16. In that case, Goulds contracted with Utica and Aetna, Traveler's predecessor, for primary, umbrella, and excess policies. The parties agreed that the aggregate limit sections of the 1977-81 Utica primary policies contained blank spaces. The Court described that "next to the language 'Bodily Injury Liability and Property Damage Liability' the policies identify the aggregate limit thusly: '$,000.'" Id. at *15. However, the 1982 Utica primary policy listed a $500,000 product liability aggregate limit. The Court applied California law and found through the use of secondary evidence that the aggregate limit sections of the 1979 through 1982 policies were left blank by mistake. It was noted that the result would be the same under New York law, as New York permits the use of extrinsic evidence to determine the parties' intended meanings if there are multiple meanings that can be derived from a contract term. The Court went on to explain that the Utica primary policies included a form endorsement which created an internal ambiguity sufficient to permit the admission of extrinsic evidence.

Again, the factual differences between the cases renders Travelers unhelpful for much guidance. Like the Clearwater decision, Travelers: involved different policy years; had primary policies available for the Court to examine and then find an ambiguity, permitting the admissibility of extrinsic evidence (if the issue was analyzed under New York law which it was only considered in dicta); and was supported by a different evidentiary record regarding the presence of aggregate limits including a complete lack of extrinsic evidence presented by the defendant whom took the position that the primary policies were unambiguous. By contrast,

as explained below, here there is evidence demonstrating the primary policies did not contain aggregate limits for bodily injury.

Finally, FFIC misinterprets the New York Court of Appeals' holding in USF&G. Relying on USF&G, FFIC urges that "a reinsurer will not be bound by provisions in a settlement agreement if those provisions were inserted by the reinsured in order to maximize potential recoveries from it reinsurers." Def.'s Mem. of Law in Supp. of Mot. for Summ. J. on Count I, ECF No. 285, at 1. However, that is not the standard of law articulated in USF&G. Instead, the Court held that a reinsurer is bound only by a reinsured's good faith decisions. USF&G, 20 N.Y.3d at 420. It noted: "While that expression might seem to suggest that the cedent's subjective intentions are critical, most decisions also consider reasonableness or some other objective element." Id. (internal citations omitted). As explained above, "[r]easonableness does not imply disregard of a cedent's own interests. Cedents are not the fiduciaries of reinsurers, and are not required to put the interests of reinsurers ahead of their own." Id. The Court further elaborated:

> As the Third Circuit put it in Travelers v INA: "[T]o establish a breach of the duty of good faith, it is not sufficient simply to demonstrate that a particular allocation decision increased the insurer's access to reinsurance, at least not where the insurer is able to point to some legitimate (i.e., non-reinsurance-related) reason for the challenged decision" (609 F3d at 158-159). We mean by "reasonable" essentially what we take the Third Circuit to mean by "legitimate": The reinsured's allocation must be one that the parties to the settlement of the underlying insurance claims might reasonably have arrived at in arm's length negotiations if the reinsurance did not exist.

USF&G, 20 N.Y.3d at 420-21.

The USF&G Court went on to reject the Third Circuit's conclusion in Travelers Casualty and Surety Co. v. Ins. Co. of North America, 609 F.3d 143, 159 (3d Cir. 2010) that

a cedent's allocation could be rejected if the cedent was motivated primarily by reinsurance considerations. USF&G, 20 N.Y.3d at 421. In doing so, the New York Court of Appeals held:

> We conclude, however, that the cedent's motive should generally be unimportant. When several reasonable allocations are possible, the law . . . permits a cedent to choose the one most favorable to itself (see id.; Gerling, 419 F.3d at 193 [an "allocation that increases reinsurance recovery . . . would rarely demonstrate bad faith in and of itself"]). We think it unrealistic to expect that the cedent will not be guided by its own interests in making the choice.

Id. In sum, a cedent's motive to reach reinsurance, while singularly unimportant, may invalidate the follow the settlement protection if it causes the cedent to make an unreasonable settlement allocation.

With these principles in mind, Utica's factual allegations,[12] liberally construed, raise the reasonable possibility that its settlement with Goulds was reasonable, in good faith, and justified by legitimate business reasons, thus requiring FFIC to follow the settlement. For instance, FFIC asserts Utica insisted the Settlement Agreement include stipulations that all of the primary policies contained aggregate limits and that those limits had been exhausted; however, the stipulations applied to over 30 years of policies, even though the Goulds coverage litigation focused on only five of those years. Namely, the 1966-72 primary policies underlying the umbrella policies reinsured by FFIC and swept into the stipulation were not litigated between Utica and Goulds. FFIC contends the stipulations were admittedly unnecessary to reaching the deal; specifically the stipulations were labeled "gratuitous" by

---

[12] In submitting its evidence, plaintiff incorporated its Statement of Material Facts submitted in support of its Motion for Partial Summary Judgment on the Follow the Fortunes Doctrine as its permitted Statement of Additional Material Facts in Response to FFIC's Motion for Summary Judgment on Count I of Utica's Amended Complaint. See Pl.'s Stmt. of Mat. Facts in Supp. of Partial Mot. for Summ. J. on the Follow the Fortunes Doctrine, ECF No. 287-2 ("Pl.'s SMF FTF").

Utica's General Counsel, Bernard Turi ("Turi"). Def.'s Stmt. of Mat. Facts in Supp. of Mot. for Summ. J. on Count I, ECF No. 285-1, ¶ 6 ("Def.'s SMF Count I"). A draft settlement agreement with Turi's handwritten comments includes the notation under the section entitled "Exhaust of Goulds Primary Policies for Product Liability Claims" directing "Need gratuitous language on aggregate limits." LoPatto Decl., Ex. 8, ECF No. 285. According to FFIC, the insertion of gratuitous stipulations concerning aggregate limits merely underscores Utica's top concern, which was to push the $325 million settlement payment on its reinsurers whether or not credible evidence existed for doing so.

Utica however disputes that the term "gratuitous" meant unnecessary. Instead, Turi testified that he wrote this note because he wanted to include "[p]roactive language" that designated that Utica had aggregate limits in that particular section of the Settlement Agreement. He indicated that he wanted a second, gratuitous statement that the primary policies had aggregate limits, which was redundant with the Settlement Agreement's initial listing of the aggregate limits in the primary policies. Pl.'s Resp. to Def.'s SMF Count I, ECF No. 309-1, ¶ 6. He testified that "gratuitous" did not mean that the aggregate limit provisions were unnecessary.

Next, Turi conceded in his deposition that Utica insisted the Settlement Agreement include the aggregate limit and exhaustion stipulations in order to foreclose the issue with reinsurers, because Utica "didn't want to have this whole fight with Goulds and then this whole fight with reinsurers" but wanted it "resolved once and for all [on] the aggregate issue." Def.'s SMF Count I, ¶ 7; LoPatto Decl., Ex. 7, ECF No. 285, 99:9-100:15, 100:24-101:5 ("Turi Dep."). However, Turi testified that "it wasn't a consequence of that we had reinsurance, that we agreed that we had aggregate limits." Turi Dep. at 85:15-17. He also testified that

avoiding a fight with reinsurers was one of "several reasons" for including the aggregate limit and exhaustion provisions, not "the purpose." <u>Id</u>. at 99:9-100:15.

Another reason was to cap Utica's liability under the primary policies, which was important regardless of whether Utica had reinsurance. <u>Id</u>. at 84:18-86:5. Turi testified that the need to cap Utica's liability under the primary policies was the "primary reason" for the settlement.

> A.    Again, if there was no aggregates, Goulds, under California Law . . . could select a policy year and have each individual claim go over and over and over again on an unaggregated basis. . . . They would pick a year and each claim would be subject to that limit and there'd be no cap. So that was the biggest reason. I mean, that far outweighed any reinsurance claim. So that was the primary reason.

Pl.'s Resp. SMF Count I, Ex. A, 51:24-52:10; <u>see also</u> <u>id</u>. at 51:13-53:4;53:17-54:8; Pl.'s Resp. SMF Count I, Ex. C, 84:18-86:5; 93:24-94:14. Another reason for the settlement's terms was that Utica believed it had a strong case that the primary policies did in fact have aggregate limits. Exhibit C, 84:18-86:5. A third reason was to avoid fights with Utica's other umbrella carriers. <u>Id</u>. at 99:16-100:6. Turi testified that "the issue of aggregate limits went well beyond the question of reinsurance." <u>Id</u>. at 85:21-22.

Utica's Executive Vice President and attorney Kristin Martin ("Martin") testified in agreement with Turi, stating that "[t]he primary purpose for putting the aggregate limits in the agreement was that it was a contested issue between Goulds and Utica, so that's why it was in the agreement." Pl.'s Resp. SMF Count I, Ex. B, 151:4-7 ("Martin Dep."). Specifically, even though Goulds was not pushing its argument with respect to years outside of 1978-82 at the time of the settlement, "[t]here was no way [Utica was] going to sign a settlement

agreement that didn't clearly articulate what our coverage was, because otherwise they'd be back." Id. at 155:4-7.

According to FFIC, Martin confirmed that Utica wanted to make sure that there was nothing in the Settlement Agreement that would jeopardize Utica's ability to collect reinsurance. Def.'s SMF Count I ¶ 8; LoPatto Decl., Ex. 9, ECF No. 285, at 160-62. Martin testified that "we didn't want to do anything [in the Settlement Agreement] that would impact [reinsurers] or give them a right not to pay." Id. Utica contends that the cited excerpts do not discuss the reasons *why* Utica included the aggregate limit provision in the settlement.

In further support of the argument that Utica was improperly focused on reinsurance, FFIC submits an email dated February 6, 2006 from Martin to Richard Creedon, Utica's then General Counsel and Senior Claim Officer, which refers to the "reinsurance impact" of Utica's allocation of the Goulds' costs. Def.'s SMF Count I, ¶ 9. According to FFIC, Goulds' attorney Jay Konkel ("Konkel") also testified that Utica demanded aggregate and exhaustion provisions in the Settlement Agreement for reinsurance purposes. Id. ¶ 10.

Utica points out that Konkel does not comment on the reasons *why* Utica sought aggregate and exhaustion provisions in the Settlement Agreement. Instead, he speculates about the reasons why Utica sought a judicial determination (from the judges who conducted the mediation) finding that the parties negotiated and consummated the settlement in good faith. Utica submitted the following testimony from Konkel:

> Q.  And again, you do not know why [Utica] wanted a good faith settlement determination?
>
> A.  I, I don't know why. I might have intuited it.
>
> Q.  What do you mean "intuited"?

> A.    It was a guess.  I don't know.

> Q.    What was your guess?

> A.    It might have been pertinent for reinsurance-related issues.

Id. at 93:20-94:6.  Utica urges the court to find Konkel's testimony speculative and contends

it has no bearing on the reasons Utica sought aggregate and exhaustion provisions in the

Settlement Agreement; Konkel himself admitted that his testimony was only "a guess" and

that he had no direct knowledge of Utica's motivations.

Next, Utica's privilege log includes multiple entries noting redactions for "legal advice

regarding reinsurance" throughout the time that Utica and Goulds were negotiating the

settlement.  Def.'s SMF Count I, ¶ 11.  For example, Utica redacted portions of emails

reflecting reinsurance advice in December 2005.  Id.  Utica also redacted internal

memoranda drafted in February 2007 based on "legal advice regarding reinsurance and in

connection with anticipation of litigation."  Id.  According to FFIC, this is dispositive as to

Utica's ill motives.

Utica does not dispute the privilege log entries.  However, courts will not make

adverse inferences based on a party's assertion of the attorney-client privilege.

Galderma Labs. v. Paddock Labs., No. 09-cv-002, 2011 WL 1119700, at *4 (N.D. Tex. Mar.

28, 2011); see also Nabisco, Inc. v. PF Brands, Inc., 191 F.3d 208, 226 (2d Cir. 1999),

abrogated on other grounds by Moseley v. V Secret Catalogue, Inc., 537 U.S. 418

(2003) (holding that it is improper to draw an adverse inference from the invocation of the

attorney-client privilege).  Moreover, any inferences FFIC could draw from the privilege log,

even if permissible, are merely speculative.

Next, a Memorandum dated May 1, 2006 from Turi to judges and mediators, acknowledges that Utica's "reinsurance concerns" had been explained "at great lengths" during prior mediation sessions.  Def.'s SMF Count I, ¶ 12.  Again, Utica does not dispute the existence of the document but contends "reinsurance concerns" were not the reason it and Goulds agreed that the primary policies had aggregate limits.  Rather, it referenced those concerns as a reason why Utica could not provide more than $350 million for the asbestos claims and $260 million for all other claims, as Goulds proposed.  Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Part. Summ. J. on Count I, at 18.  Also submitted by FFIC, an email dated February 1, 2007 in which Utica's California counsel, Joseph Hegedus ("Hegedus"), asked Turi to discuss Utica's "reinsurance."  Def.'s SMF Count I, ¶ 13.  According to Utica, Hegedus asked to discuss "reinsurance generally" and there is no evidence regarding which reinsurance Hegedus was referring to; there is no indication that this email even pertains to Utica's reinsurance for the Goulds policies.  Even if it were about the Goulds reinsurance, an insurer does not lose its reinsurance because it is aware of its reinsurance.

Next, FFIC contends that a PowerPoint presentation to Utica's Board of Directors prepared in connection with approval of the Settlement Agreement warned that without aggregate limits, "[t]he [Goulds asbestos] claims would not reach the umbrella or the reinsurance recoveries in those layers" and "[t]he convergence of the lack of aggregate limits, along with control of the defense (and settlement) would be catastrophic for the company."  Def.'s SMF Count I, ¶ 14.  Utica includes the entire context of the presentation and argues this amounts to nothing.  According to Utica, stating that it could continue to collect reinsurance on its umbrella policies after the settlement was simply a fact; it does not show that Utica dishonestly agreed to aggregate limit provisions.  Utica's position throughout

its dispute with Goulds was that the primary policies had aggregate limits, and once these limits were exhausted, any Utica payments would be under the umbrella policies. Those aggregate limits exhausted years before the settlement and Utica was collecting reinsurance on the umbrella policies for years prior to the settlement.  Before the Settlement Agreement, Goulds' position was that the Utica primary policies should respond to the asbestos loss.

FFIC next points to an email chain in February 2007 between Utica and its New York coverage counsel which attached a summary of the proposed settlement, and noted that "of all of GP's [Goulds'] allegations, the lack of aggregate limits of liability for asbestos claims presented the most significant downside to UMICO [Utica]."  Def.'s SMF Count I, ¶ 15.  The summary further noted that without aggregate limits, the primary policy would never exhaust, and this "would prevent claims from going into the umbrella layer and the reinsurance recovery that would follow."  Id.  The summary warned that this result would be "disastrous" for Utica.  Id.  It also noted that "[c]ombining the lack of aggregates with the defense control in the hands of our former policyholder, with no reinsurance recovery possible and our very existence is threatened."  Id.  The "Conclusion" of the summary provides:  "Based upon all of the factors (litigation risk, terms of the settlement, REDACTION REDACTION) it is recommended that the settlement of this litigation be consummated . . . ."  Id.  The entry on Utica's privilege log for this redaction notes that it is for a "communication related to legal advice regarding reinsurance and in connection with anticipation of litigation."  Id.  Again, courts will not make adverse inferences based on a party's assertion of the attorney-client privilege.

Finally, FFIC relies on an email dated April 17, 2007, from Goulds' counsel to Utica counsel which indicated that Utica was focused on ensuring that the court would include a

"good faith settlement" determination in its order to help Utica thwart later challenges from reinsurers. Def.'s SMF Count I, ¶ 16. In the email, Konkel describes Utica's actions as follows: "I tried to get an understanding of the proposed additional 'findings' that you wanted to put in front of Judge Lichtman but my limited understanding is that you appear to be insisting still on trying to get the 'good faith settlement' determination that we explained to you several weeks ago would not be achievable . . . ." Id.

Utica disputes that the email indicates that Utica was "focused on ensuring that the court would include a 'good faith settlement' determination in its order to help Utica thwart potential challenges from reinsurers." Turi denied that Utica was "insisting" or "pushing" for such a determination. Pl.'s Resp. SMF Count I, Ex. A, 123:5-15. Instead, he testified as follows:

> I don't know that I was insisting or pushing. I was told that you can get good faith orders in California. This case seemed to be ripe for one. I was not familiar with the process before hearing it from counsel, and it made sense to me once I heard about it. And I said, yeah, I wanted it at that point because it made sense to do it.

Id. at 123:9-15. Utica argues that FFIC's Exhibit 17 does not reference reinsurance, much less even suggest that Utica sought a good faith order to thwart challenges from reinsurers. Instead, Turi testified that Utica sought a good faith order to assist in litigation involving Goulds' other direct insurers. Id. at 127:2-14. Utica contends that this email has nothing to do with the reasons why Utica included an aggregate limit provision in the Settlement Agreement nor does it say anything about reinsurance. See Pl.'s Resp. SMF Count I, ¶ 16.

On the basis of all of the evidence in question, Utica's counsel advised during the coverage litigation that "there is no viable dispute but that Utica's primary policies issued from

1955 to the early 1970s had aggregate limits." Pl.'s SMF FTF, ¶ 11. This advice, coupled with the above evidence, rendered Utica confident that all of the primary policies (including those from 1966 to 1972) had aggregate limits. It maintains that it had every reason to ensure that the Settlement Agreement established this fact, and as Turi testified, leaving anything on the table for Goulds to raise again later would not have been "prudent." Pl.'s SMF FTF, ¶30. Although Utica's Board was presented with memoranda explaining the reinsurance impact of the settlement terms, consideration of that impact alone does not amount to gross negligence or recklessness.

According to Utica, the common flaw in all of FFIC's evidence is the assumption that it somehow acted improperly in taking the steps any prudent insurer would have taken with respect to the Goulds asbestos loss. Those steps were: (1) getting agreement from the policyholder that the primary policies had aggregate limits, which was Utica's position from the beginning; (2) getting agreement from the policyholder that the primary policies were exhausted for the asbestos loss, such that any future payments for the loss must come from the umbrella policies; and (3) seeking a "good faith" settlement determination from a court, in order to protect against third-party challenges (i.e., coinsurers) to the settlement. In other words, these were all reasonable steps, and the fact that the endpoint was Utica's payment of the asbestos loss from umbrella policies does not excuse FFIC from its duty to follow the settlement.

FFIC has presented insufficient evidence on its motion for summary judgment to establish as a matter of law, that Utica lacked a reasonable basis for the settlement. Utica has put forth facts from which a reasonable fact finder could conclude that the settlement decision to insert the provision regarding the presence of aggregate limits was reasonable

because sufficient evidence supported its position.  Defendant's motion for summary judgment on the follow the settlement contention will be denied because disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment.  Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury.  Non-movant Utica has put forth facts from which a reasonable trier of fact could conclude that FFIC must follow the settlement.

Therefore, FFIC's motion for summary judgment on <u>Count I</u> of the Amended Complaint regarding Utica's follow the settlement contention will be denied.

### 5. <u>Motion in Limine to Preclude Expert Testimony of Dennis R. Connolly</u> (ECF No. 331) (332 sealed)

FFIC moves in limine to preclude the expert testimony of Utica witness Dennis R. Connolly ("Connolly").  Connolly is expected to testify that it is irrelevant that the Umbrella Declarations pages fail to state that there were aggregate limits for bodily injury.  According to Connolly, it is implicit in every policy covering products liability that there would be aggregate limits for bodily injury *and* property damage arising from those products.  FFIC moves to exclude his testimony on the basis that his opinions regarding the inclusion of aggregate limits are unreliable and speculative, he cannot provide any support for his theories, his theory is contradicted by the evidence, and his theory is inadmissible as custom and practice.  Further, FFIC urges that his opinion impermissibly seeks to resolve a critical issue in the case, his historical discourse is irrelevant and inadmissible, and his opinions have been repeatedly challenged and rejected.

Utica opposes and contends Connolly, who has fifty years of experience in the industry and has examined thousands of policies offering products liability coverage during

that time, has based his corroborated opinion on training and experience. Utica urges that numerous secondary sources support Connolly's opinions and a court has already admitted his same expert opinion in other litigation involving primary policies that Utica issued to Goulds. Utica disputes that his opinions are inadmissible just because they embrace an ultimate issue for the jury; instead, his opinions provide context to evaluate FFIC claims about the meaning of documents in its files.

Federal Rule of Evidence 702 permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" provided that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case. FED. R. EVID. 702.

"The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011), cert. denied, 132 S. Ct. 833 (2011). This role as gatekeeper requires a court to make three, related findings before permitting a person to testify as an expert: "(1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will 'assist the trier of fact.'" Valente v. Textron, Inc., 931 F. Supp. 2d 409, 415 (E.D.N.Y. 2013) (quoting Nimely v. City of N.Y., 414 F.3d 381, 396-97 (2d Cir. 2005)). In Daubert v. Merrell Dow Pharmaceuticals., Inc., 509 U.S. 579 (1993), the Supreme Court set forth a non-exhaustive list of factors that bear on the reliability aspect of this inquiry:

> (1) whether a theory or technique has been or can be tested;
> (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). "These factors do not constitute, however, a definitive checklist or test. Rather, [t]he inquiry envisioned by Rule 702 is . . . a flexible one." Davis v. Carroll, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) (citation omitted).[13]

The flexibility contemplated by Rule of Evidence 702 is particularly helpful when an expert's testimony does not rest on traditional scientific methods. "In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that '[e]xperts of all kinds tie observations to conclusion through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" Davis, 937 F. Supp. 2d at 412 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149-50 (1999)). "Thus, the Daubert factors do not necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." Id. (citation and internal quotation marks omitted).

Whether based on traditional science or specialized experience, Rule of Evidence 702 further mandates that an expert "stay within the reasonable confines of [their] subject area, and [thus] cannot render expert opinion on an entirely different field or discipline." Lappe v.

---

[13] Of course, "[e]xpert testimony must also be relevant under Rule 401 and must not be unfairly prejudicial under Rule 403." Davis, 937 F. Supp. 2d at 412.

Am. Honda Motor Co., Inc., 857 F. Supp. 222, 227 (N.D.N.Y. 1994), aff'd sub nom., Lappe v. Honda Motor Co. Ltd. of Japan, 101 F.3d 682 (2d Cir. 1996).  In other words, "where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of their expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case."  Davis, 937 F. Supp. 2d at 413.

As always, "[t]he proponent of the expert testimony bears the burden of 'establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.'"  Valente, 931 F. Supp. 2d at 415 (quoting Williams, 506 F.3d at 160).  Importantly, however, "[t]he Second Circuit has held that under the Federal Rules of Evidence, there is a general presumption of admissibility of evidence."  Hilaire v. DeWalt Indus. Tool Co., 54 F. Supp. 3d 223, 235 (E.D.N.Y. 2014) (citation and internal quotation marks omitted).  Accordingly, "the rejection of expert testimony is the exception rather than the rule."  FED. R. EVID. 702 advisory committee's note.

Ultimately, "a trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith' or to be in essence an apples and oranges comparison."  Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) (internal quotation marks omitted).  However, "[t]o the extent that a party questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert."  R.F.M.A.S., Inc. v. Mimi SO, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010).  Simply put, "our adversary system provides the necessary tools for challenging reliable, albeit

debatable, expert testimony."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

Keeping the court's gatekeeping role in mind, Utica has established that Connolly's experience qualifies him to opine on insurance industry custom and practice respecting the use of aggregate limits in products liability policies.  His experience since 1965 includes working as "captive counsel" for 11 years for two insurance companies litigating coverage disputes and working for the American Insurance Association ("AIA"), the leading trade association for casualty and property insurers, for another 11 years.  While at the AIA he worked on proposals for product liability reform and drafted a report providing underwriters information about how to underwrite products liability coverage.  He has also served as Chairman of two task forces appointed by the National Association of Insurance Commissioners to address issues related to the underwriting of liability insurance.  For another 11 years Connolly managed the Claims Department and the Casualty Department of one of the largest insurance brokers in the world.  In that capacity he managed underwriters responsible for writing product liability policies and negotiated terms of that coverage.  For the next seven years he was a Managing Director of another large insurance broker, where he advised clients regarding insurance policy language.  Since 2004, he has worked as an expert witness and consultant on mass tort and insurance issues, and has testified more than 60 times on topics related to the insurance industry.  These experiences, and others listed in his expert report, no doubt qualify Connolly to offer his expert opinion.  His personal knowledge and experience of the subject matter permit him to tie observations to conclusions through general truths derived from specialized experience.

Next, Connolly's opinion is based upon reliable data and methodology; his opinion is based on his experience and corroborating third party sources. He has explained the connection between his experience and his opinion, and corroborated the explanation with outside sources. He testified that out of the thousands of primary policies that he has reviewed, only two policies provided coverage without aggregate limits. That experience provides a reliable basis for his opinion. He also bases his opinion on his experience with the process of pricing insurance policies. Finally, numerous third party sources support his statement that since the 1940s, aggregate limits were routinely included in the standard commercial general liability form and his statement that the ratings manuals assumed the inclusion of an aggregate limit, such that rating a products liability policy without an aggregate limit was impossible.

Finally, Connolly's testimony on the custom and usage of aggregate limits will assist the trier of fact. Connolly's opinion addresses whether the 1966-72 policies were issued consistent with industry practice, and thus whether they contained aggregate limits for bodily injury. This testimony will assist the fact finders resolve the ultimate issue, whether FFIC breached the Certificates and is liable to Utica for $35 million.

Utica has met its burden to establish by a preponderance of the evidence that the admissibility requirements of Federal Rule of Evidence 702 have been satisfied. Connolly's testimony is not speculative nor conjectural nor based on unrealistic assumptions. Utica has established he is qualified, his opinion is reliably based, and his testimony will assist the trier of fact. All of FFIC's criticisms go to the weight of the evidence and it is free to present those challenges through cross-examination and introduction of its own expert witness.

Accordingly, FFIC's motion in limine to preclude the expert testimony of Dennis R. Connolly will be denied.

## B.  Plaintiff Utica's Motions

### 1.  Motion for Partial Summary Judgment on the Follow the Fortunes Doctrine
(ECF No. 274) (287 sealed)

Utica moves for partial summary judgment on FFIC's defense that FFIC does not have to follow the fortunes because Utica's settlement with Goulds was unreasonable and made in bad faith.  It would follow that, pursuant to the follow the fortunes doctrine, the Utica-Goulds settlement is binding on and cannot be second guessed by FFIC.  Utica contends it had multiple claims related reasons for settling the Goulds claims on the basis that all of its primary policies had aggregate limits.  Utica also argues the settlement would have occurred in the absence of reinsurance, because Utica was unaware of FFIC's reinsurance at the time it settled.

FFIC opposes and argues the doctrine does not bind it to a fraudulent and objectively unreasonable settlement.  It argues the settlement was not reasonable because the stipulations agreeing to the aggregate limits and exhaustion were unsupported and dishonest.  Specifically, it was not necessary for Utica to insert those stipulations in the Settlement Agreement in order for Utica to cap liability at $325 million, contrary to what Utica contends.  Further, FFIC contends there is a factual dispute as to whether there was a threat that Goulds would contest the presence of aggregate limits as Utica claims.  Finally, FFIC argues the Certificates show there were no aggregate limits in the primary policies, but if extrinsic evidence is admitted, summary judgment must be denied because there is a factual dispute as to the existence of those limits.

Keeping in mind the above legal standards regarding the follow the fortunes doctrine, FFIC's factual allegations, liberally construed, raise the reasonable possibility that the Utica-Goulds settlement was unreasonable and in bad faith, relieving FFIC from having to follow the fortunes of its reinsured. First, Utica maintains that the main driver of the settlement was the need to cap Utica's liability under the primary policies. Pl.'s Resp. SMF ¶ 7. The presentation to Utica's Board of Directors before approval of the settlement emphasized this point, noting that "[t]he limit would not exhaust if there was no aggregate" and thus "[e]ach of the 80,000 plus asbestos claims would have a fresh limit of $500,000 for each claim." Id. ¶ 14. Using these numbers, the Goulds asbestos liability could have been a multi-billion dollar affair. The presentation to the Board noted that even a single year without an aggregate limit could lead to excessive liability under the "All sums" approach. Id. ¶ 7, 14. This is because "California law allows the policyholder to select a year in which all claims are handled." Id. ¶ 7. Because of this, Utica contends it was basic common sense for it to confirm in the Settlement Agreement that all of its primary policies had aggregate limits which were exhausted. Utica asserts that the insertion of the stipulations was also to protect against claims (that Utica's primary policies lacked aggregate limits) by Goulds' other insurers. Id.

FFIC contends the stipulations were not necessary to limit Utica's liability. Instead, Utica could have accomplished the same result in other ways; it could have agreed upon $325 million in coverage without including the stipulations about the 1966-1972 years for which FFIC provided coverage and which had not been litigated by the parties. Nor were the stipulations necessary for Utica to avoid financial ruin under the "all sums" rule. Moreover, Goulds had no interest in how Utica allocated the settlement funds to its policies; the only

issue that mattered to Goulds was whether Utica could come up with the $325 million and since Goulds knew that Utica depended on its reinsurance to do that, Goulds had an incentive to agree to the stipulations.

According to Utica, in light of the extensive evidence—well before the settlement with Goulds—that all of the primary policies had aggregate limits, it was more than reasonable to conclude the policies had aggregate limits and to include those limits in the Settlement Agreement. First, the 1960 to 1961 primary policy had a $300,000 aggregate products limit applicable to bodily injury. Pl.'s SMF FTF, ¶ 31(a). According to FFIC this is irrelevant because for one, it was issued six or more years before the policies at issue. Def.'s Resp. to Pl.'s SMF FTF, ECF No. 311, ¶ 31(a) ("Def.'s Resp. SMF FTF").

Next, a set of documents from the 1971 primary policy, as marked up to show revisions for the 1972 primary policy, lists a $300,000 aggregate limit for bodily injury. Pl.'s SMF FTF ¶ 31(b). FFIC points out that the pages reflecting an aggregate limit are not dated, and therefore, it is not clear where, if anywhere, these pages fall within the years that are actually at issue. Def.'s Resp. to Pl.'s SMF FTF ¶ 31(b). Further, two declarations pages of the 1972 primary policy, as marked up to show revisions for the 1973 primary policy, lists $300,000 aggregate limits for bodily injury. Pl.'s SMF FTF ¶ 31(c). FFIC points out that one of the pages does not include a property damage aggregate, thus the terms on the two pages are in conflict. Def.'s Resp. to Pl.'s SMF FTF ¶ 31(c). FFIC disputes that any of the aforementioned evidence supports the imposition of a $300,000 aggregate limit for bodily injury in each of the 1966-1972 primary policies.

Utica also submits two declarations pages for the 1973 primary policy which include a $300,000 aggregate limit for bodily injury. Pl.'s SMF FTF ¶ 31(d). Again, FFIC argues these

pages are irrelevant to whether the 1966 to 1972 policies have aggregate limits. Def.'s Resp. to Pl.'s SMF FTF ¶ 31(c). Next, the CGL form that Utica used to issue the 1966 to 1972 policies includes a term stating that "the total liability of the company for all damages because of 1) all bodily injury included within the completed operations hazard and 2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the schedule as 'aggregate.'" Pl.'s SMF FTF ¶ 31(e). According to Utica, the use of this form suggests that it always contemplated having aggregate limits for products liability. Id. According to FFIC, this language simply instructs that any limit, as stated, will be enforced. Def.'s Resp. SMF FTF ¶ 31(e). Further, Utica has not and cannot submit proof that this form was used because the primary policies in question have never been found. Id.

Utica next points to a November 15, 1967, certification by the Secretary of Goulds Pumps, Inc. that Goulds Pumps' Comprehensive Liability Coverage had an aggregate products limit. Pl.'s SMF FTF ¶ 31(f). FFIC disputes that this evidence supports the imposition of a $300,000 aggregate limit for bodily injury in each of the 1966 to 1972 primary policies. Def.'s Resp. SMF FTF ¶ 31(f). In fact, other Certificates evidence a property damage aggregate, but not a bodily injury aggregate. FFIC submits that since the Certificates are in conflict, they are not a reliable indication of coverage limits. Id.

Further, Utica relies on the following Certificates of Insurance identifying Goulds Pumps, Inc., Vertical Pump Division as the named insured: three for the 1970 policy period including a $300,000 aggregate products limit for bodily injury; one for the 1970 policy period marked up for the 1971 policy period including a $300,000 aggregate products limit for bodily injury; one for the 1971 policy period marked up for the 1972 policy period including a $300,000 aggregate products limit for bodily injury; six for the 1972 primary policy showing

that the policy had a $300,000 aggregate products limit for bodily injury; and another for the 1972 primary policy showing that the policy had a $300,000 aggregate limit for bodily injury. See Pl.'s SMF FTF ¶¶ 31(g)-(k). Again, FFIC disputes the relevancy of these Certificates; other Certificates evidence a property damage aggregate, but not a bodily injury aggregate. Again, as the evidence presented by the Certificates is in conflict, they are not a reliable indication of coverage limits. Def.'s Resp. SMF FTF ¶ 31(g)-(k).

Next, two documents from Goulds' file titled Insurance Program Goulds Pumps, Incorporated and dated November 21, 1966 and November 15, 1971 list limits for Comprehensive Liability and include a $300,000 aggregate products limit for bodily injury. Pl.'s SMF FTF ¶¶ 31(l), (m). FFIC explains that the face of these documents do not reflect who drafted them or what source documents were used to do so. Def.'s Resp. SMF FTF ¶¶ 31(l),(m).

Plaintiff points to Goulds Pumps' application for the umbrella policy with a policy period from July 1, 1969 to July 1, 1970, which includes a schedule of underlying insurance that identifies the underlying public liability primary policy as including products-completed operations coverage and lists the bodily injury limits for that policy as 100/300/300. Pl.'s SMF FTF ¶ 31(n). Defendant contends that the Schedule in the application is in direct conflict with the Schedule of Underlying Insurance in the Umbrella Liability Policy No. 1930 GLU, which shows that for the 1969 Primary Policy No. 8256LC for Public Liability, there are bodily injury limits of $100,000 each person and $300,000 each occurrence, but no aggregate limit. Def.'s Resp. SMF FTF ¶ 31(n).

Further, testimony from multiple Utica employees to attempt to show that its custom and practice was to "always require aggregate limits for products hazard coverage" in every

policy that Utica issued.  Pl.'s SMF FTF ¶ 31(o).  Defendant disputes the implication of that

testimony.  Instead, the testimony is contradicted by several documents including a letter

from Goulds' counsel identifying and attaching Utica policies without aggregate limits, and

according to FFIC, the Utica's California coverage counsel's admonition that he didn't believe

it was possible to make the blanket characterization that all the primary policies are subject to

aggregate limits.  Def.'s Resp. SMF ¶ 31(o).

     Barry Bradshaw ("Bradshaw"), Goulds' in-house counsel responsible for its insurance

program in the 1970s, testified that he understood that all of Utica's primary policies he was

involved with had limits.  Pl.'s SMF FTF ¶  33.  FFIC contends Bradshaw lacks the personal

knowledge to make a reliable assertion about the aggregate limits for bodily injury in the

1966 to 1972 primary policies because he admitted he was not involved before 1970 and

thus did not participate in negotiating the terms of the 1966 to 1970 primary or umbrella

policies.  He was also completely unaware that Goulds had previously argued there were no

aggregate limits in the 1978 to 1982 primary policies before settling with Utica.  Def.'s Resp.

SMF FTF ¶  33.

     Utica has presented insufficient evidence on its motion for summary judgment to

establish as a matter of law, that it had a reasonable basis for the settlement.  Plaintiff's

motion for summary judgment on the follow the fortunes doctrine will be denied because,

similar to FFIC's motion on this issue, disagreements over what inferences may be drawn

from the facts, even undisputed ones, preclude summary judgment.  Credibility

determinations, the drawing of legitimate inferences from facts, and the weighing of evidence

are matters left to the jury.  Non-movant FFIC has put forth facts from which a reasonable

trier of fact could conclude that Utica is not entitled to the protections of the follow the fortunes doctrine.

FFIC has submitted ample evidence, when viewed in a light most favorable to it, of Utica's extreme efforts to ensure an allocation of the settlement to its umbrella policy reinsurers, proving it was impermissible and in bad faith.  Drawing all inferences in its favor, a rational trier of fact could conclude that Utica included the stipulations in the Settlement Agreement regarding aggregate limits and exhaustion and payment by the umbrella policies solely to ensure access to its reinsurance because in the absence of reinsurance Utica would have had no incentive to make these stipulations.  Under this version of the facts, Utica's allocation was improper and in bad faith and would not have resulted from arm's length negotiations if reinsurance did not exist, and FFIC would therefore not be required to follow the terms of the Settlement Agreement.

Accordingly, Utica's motion for partial summary judgment on the follow the fortunes doctrine will be denied.

### 2.  Motion for Partial Summary Judgment That FFIC Is Not Entitled To Rescission (ECF No. 283) (289 sealed)

Utica moves for partial summary judgment dismissing FFIC's counterclaims seeking rescission.  The counterclaims seek rescission of the Certificates issued to Utica on the basis of its misrepresentation of the terms of the underlying insurance—FFIC claims that if the policies did in fact have $300,000 aggregate limits for bodily injury as Utica now claims, Utica made misrepresentations to, or concealed facts from FFIC, concerning the absence of aggregate limits at the time the certificates were executed.  Due to the passage of time, neither party has complete underwriting files respecting the underwriting and issuance of the

Certificates in the 1966-72 period, nor were any witnesses deposed who had firsthand involvement in the specific reinsurance transaction.

Utica contends FFIC cannot support its burden of proof on its counterclaims because it cannot rely on the testimony of witness Garrett Redmond, the 85 year old chief underwriter for the FFIC department that wrote this reinsurance, because, among other reasons, he was not the actual underwriter. Utica also contends aggregate limits in the underlying policies were a standard term in liability policies in the 1960s and 1970s and Utica had no obligation to disclose this term to FFIC. Further, Utica takes issue that on one hand, FFIC argues there were no aggregate limits and the stipulation to those limits between Utica and Goulds in the Settlement Agreement was fraudulent, yet its rescission claim is based on the premise that the policies did contain those aggregate limits but they were not disclosed. Finally, Utica argues the rescission claims are time-barred and waived.

FFIC opposes and argues that whether or not Utica failed to tell FFIC about the aggregate limits at the time of underwriting, whether the limits were material to FFIC underwriters in evaluating Utica's risk, and whether FFIC would have charged the same premium are all factual disputes and the counterclaims cannot be resolved on summary judgment. FFIC attempts to demonstrate with evidence that Utica failed to disclose the limits when it was obligated to, and contends Redmond's credibility and personal knowledge of FFIC's underwriting of Utica reinsurance from 1966-73 are issues for a jury. Further, it argues aggregate limits are not implicit nor standard in the industry and Utica had a duty to disclose this information. If Utica had disclosed, FFIC would not have reinsured it. Finally, FFIC disputes that the rescission claims are time-barred or waived.

The duty of utmost good faith between a reinsurer and a reinsured requires "the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware." Christiania, 979 F.2d at 278 (citing Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U.S. 485, 510 (1883); Sumitomo Marine & Fire Ins. Co.-U.S. Branch v. Cologne Reinsurance Co. of Am., 75 N.Y.2d 295, 303 (1990)). An insured may violate this relationship if it so imprecisely discloses or fails to disclose certain facts such that the reinsurer was not adequately apprised of the risk. Christiania, 979 F.2d at 278. Accordingly, rescission of the contract may be warranted. "A fact is material so as to void ab initio an insurance contract if, had it been revealed, the insurer or reinsurer would either not have issued the policy or would have only at a higher premium." Id. The question of materiality is generally a question of fact. Id. Materiality turns on "whether a reasonable insured should have believed the fact was something the insurer would consider material." Id. at 278-79. Whether the fact(s) were material must be assessed as of the time the contract was entered into. Id. at 279. The issues here are: (1) whether Utica failed to tell FFIC that the underlying primary policies contained $300,000 aggregate limits for bodily injury; (2) whether the limits were material to FFIC underwriters in evaluating the risk; and (3) whether FFIC would have charged a different premium for the reinsurance, or issued the reinsurance at all, had the aggregate limits been disclosed.

First, FFIC is permitted to make alternative pleadings and inconsistent claims and defenses pursuant to Rule 8(d). Therefore, FFIC is permitted to plead in the alternative, so it can seek both rescission on the basis that there were undisclosed limits, and it can argue the policies did not have limits and thus the umbrella policy should never have been reached.

As to whether Utica failed to tell FFIC about the aggregate limits, FFIC submits testimony from the chief of the underwriting department at the time, Garrett Redmond. While Utica attacks Redmond's lack of personal involvement in the instant underwriting, such criticisms are properly reserved for cross-examination and are issues for the fact finder and not for summary judgment. That the actual FFIC individuals who underwrote the Certificates for Utica from 1966-72 are unavailable to testify does not automatically render FFIC's rescission claim a failure.

FFIC also submits descriptions of the underlying policy limits and documents provided by a Utica risk manager, the handwritten notes and correspondence of Utica's reinsurance broker, the notes and correspondence of FFIC's underwriters, and the umbrella policy schedules (the Umbrella Declarations pages) which fail to indicate aggregate limits for bodily injury in the space where, had they existed, would have been recorded. For example, there are records of telephone communications between Utica and Herbert Clough, Inc., who served as the broker-intermediary for placing Utica's reinsurance with both Gen Re and FFIC. FFIC contends these documents show that Utica communicated with FFIC through Herbert Clough, Inc. the limits of the primary policies. That these records show communications regarding aggregate limits for property damage, but make no mention of aggregates for bodily injury, certainly suggests that aggregate limits for bodily injury were not disclosed to FFIC. Additional evidence proffered by FFIC implies the same conclusion. Whether these documents are strong enough circumstantial evidence to infer Utica's failure to disclose those limits are determinations for the fact finder.

As to whether the presence of aggregate limits for bodily injury were material, it is undisputed that if there was a $300,000 aggregate limit for bodily injury in each of the primary

policies, the chances of the umbrella policies being reached and resulting in paying claims was higher than if there were no such limits. Without aggregation, the only claims to reach the umbrella policies would be those that exceed the $100,000 per person limit or the $300,000 per accident/occurrence limit. The chances of individual claims exceeding the per person or per accident/occurrence limit in the 1966-72 policy years would be significantly less than the chances of claims from multiple individuals or multiple accidents/occurrences exhausting the primary policy limits and piercing the umbrella layer were the claims aggregated. Redmond testified that whether or not there were aggregate limits in the primary policies was "sure as hell" a critical piece of information to underwriters considering the risk. He explained that an aggregate means "you're closer to the danger zone," while no aggregate means "you're further away from the risk." Thus, the presence of absence of aggregates absolutely changes the risk and Redmond testified that had underwriters been told here were $300,000 aggregates in the primary policies, it would have made a difference. They could decided against reinsuring Utica, or they could have increased the premium to compensate for the increased risk. FFIC also submits evidence of its underwriting practices, guidelines, and company records to prove the materiality of aggregate limits.

FFIC disputes that Utica was not required to disclose the presence of aggregate limits because they were standard in the industry and thus FFIC should have been aware that the primary policies contained these limits, despite no mention of them in the Umbrella Declarations pages where the limits of the primary policies were declared. It is undisputed that an insurer has no duty to disclose to its reinsurers "standard" terms generally found in underlying policies, in contrast to "unusual" terms. See Sumitomo Marine & Fire Ins. Co., 75 N.Y.2d at 303.

Utica has not carried its burden on summary judgment to show the absence of disputed material facts and its entitlement to judgment as a matter of law. All of the issues which compromise a rescission claim are factual and in dispute. The evidence, viewed in the light most favorable to FFIC, could cause a reasonable fact finder to conclude that Utica failed to tell FFIC that the underlying primary policies contained $300,000 aggregate limits for bodily injury, that the limits were material to FFIC underwriters, and that FFIC would have taken a different course of action with respect to accepting the risk and reinsuring Utica had the limits been disclosed. It cannot be said on summary judgment that there is no set of facts on which Utica's rescission counterclaim could prevail.

Finally, FFIC's rescission claim is not time-barred. Generally, under New York law, actions seeking the equitable remedy of rescission of a contract are usually governed by the six-year statute of limitations of New York Civil Practice Law and Rules section 213. The statutory period for claims seeking rescission of a contract begins to run when the cause of action accrues. N.Y. C.P.L.R. § 203(a). A cause of action does not accrue until its enforcement becomes possible; enforcement becomes possible when a claimant is able to state the elements of that cause of action and thus assert a right to relief. See Roldan v. Allstate Ins. Co., 544 N.Y.S.2d 359, 362-63 (N.Y. App. Div. 2d Dep't 1989). Therefore the limitations period did not start to run until September 2008, when Utica first demanded payment from FFIC under the Certificates because that is when FFIC could first assert a valid right to relief from a claim against it by Utica under the Certificates. That was also the first time FFIC could conduct a claims investigation to determine if Utica misrepresented or failed to disclose the aggregate limits. Accordingly, FFIC's counterclaims for rescission, pleaded on November 2, 2009, are timely.

Nor has FFIC waived its ability to assert a rescission claim. Utica contends FFIC waived the rescission claim by affirmatively relying on the Certificates after it knew of Utica's position on aggregate limits. To the contrary, FFIC did not have the facts on which its rescission claim is based until it conducted its investigation, after Utica submitted its first claim in September 2008.

Accordingly, Utica's motion for partial summary judgment dismissing FFIC's counterclaims for rescission will be denied.

### 3. Motion for Partial Summary Judgment That Notice Was Not Due Before February 1999 (ECF No. 280) (288 sealed)

Utica moves for partial summary judgment on FFIC's late notice defense. FFIC claims Utica should have notified it of the Goulds asbestos claims in 1996, when it notified Gen Re,[14] and that Utica's late notice caused it to lose approximately $15.3 million in connection with a February 1999 commutation between FFIC and Lloyd's of London/Equitas. Utica maintains it did not know of FFIC's reinsurance until 2008; FFIC contends that had Utica kept better files and had applicable written notice procedures, FFIC would have received notice in 1996. Utica now seeks a declaration that it did not owe notice to FFIC before February 1999. Utica's motivation in pursuing such a ruling would be to presumably reduce the amount of economic prejudice that FFIC could claim as a result of Utica's alleged breach of the notice provisions of the Certificates.

Utica argues there was no reasonable possibility that the FFIC reinsurance would have been involved before February 1999. Utica issued 32 years of coverage to Goulds, totaling $12 million in primary policies; the $10 million umbrella coverage would kick in after

_____

[14] Gen Re was the only reinsurer of Utica other than FFIC in 1966-72.

the $12 million in primaries was exhausted.  The first $5 million[15] of the umbrella then had to be exhausted before FFIC's $5 million in reinsurance would be reached.  In 1996, the dollar amounts of payments Utica had made to Goulds for Goulds to pay its asbestos claim settlements were nowhere near FFIC's reinsurance layer, as spread across years of policies.  Therefore there was no reasonable possibility that the FFIC reinsurance would be reached at that time.  Utica maintains that Gen Re only learned about the claims earlier, in the 1990s, through its routine review of Utica's asbestos and environmental files.  Moreover, Utica contends its reserves for future Goulds indemnity payments and the timing of when it notified other reinsurers (at the same reinsurance layer as FFIC) further support that there was no reasonable possibility that the FFIC coverage  would be reached at that time.  According to Utica, based on its practices at the time, it would have notified FFIC in 2001 when it notified other reinsurers had it known about FFIC's reinsurance.[16]  However, Utica maintains that notice would not actually have been required until 2003, as it was only then that there was a reasonable possibility that FFIC's reinsurance would be involved.

FFIC opposes and contends the lateness of Utica's notice is a question of fact for the jury—which Utica acknowledges but maintains courts have found notice to be timely as a matter of law where the reinsurer fails to meet its evidentiary burden.  FFIC argues that contrary to Utica's contentions, timely notice is not determined by when Utica paid Goulds, Utica's reserves, or when Utica notified other reinsurers who reinsured post-1972 policies (which are irrelevant).  Instead, because Utica told Gen Re about the claims in 1996, this

---

[15]  Out of the first $5 million in umbrella coverage, Gen Re reinsured all but 5% of the first million; it insured 100% of the next $4 million.

[16]  FFIC disputes that other reinsurers first learned about the claims in 2001, as letters to reinsurers stated "as previously notified."

means Utica recognized then that the asbestos claims could penetrate the 1966-72 umbrella policies for which Gen Re was almost 100 percent responsible for the first $5 million.  It would follow that a prudent insured (Utica) would have an obligation to notify the layer immediately above the umbrella policies (FFIC) that it was reasonably possible that such reinsurance might be reached.  In other words, if it was reasonable to notify Gen Re in 1996 that those umbrella policies had potential exposure for the Goulds claims, notice to FFIC as a reinsurer of those same umbrella policies would not be far behind.  At least two Utica representatives involved in reinsurance reporting testified that Utica's practice would have been to notify FFIC and Gen Re at the same time.  One Utica attorney testified that it was Utica's policy to provide notice to all reinsurers of the same insurance policies at the same time, as long as the reinsurers had the same trigger for reporting.  As both Gen Re and FFIC were represented by Herbert Clough, Inc., it is likely that the reinsurance certificates all contained the same trigger language.  Utica executive Martin testified that had she known about FFIC in 1996 and that FFIC and Gen Re were placed by the same broker, she would have provided notice to FFIC in 1996.  FFIC also disputes Utica's assessment of its exposure for the Goulds asbestos claims and its resulting determination of whether its reinsurance would be implicated.

Under New York law, "an insurer has the right to demand that it be notified of any loss or accident that is covered under the terms of the insurance policy."  Am. Transit Ins. Co. v. Sartor, 3 N.Y.3d 71, 75 (2004).  A notice requirement affords an insurer the opportunity to protect itself by investigating claims shortly after the occurrences that caused them, to set proper reserves to cover anticipated losses, to decide whether it wishes to associate in the defense of a claim, and to establish premiums that accurately reflect past loss.  Travelers

Indem. Co. v. Northrop Grumman Corp., No. 15-3117-CV, 2017 WL 391926, at *2, ___ F. App'x ___ (2d Cir. Jan. 27, 2017) (summary order) (citing Christiania Gen. Ins. v. Great Am. Ins., 979 F.2d 268, 274 (2d Cir. 1992)) ("Christiania")).

The instant Certificates require prompt notice of any accident of occurrence "which appears likely to involve this reinsurance." See Certificates. Such clauses are generally construed to require notice within a reasonable time after the duty to give notice has arisen. Christiania, 979 F.2d at 275. Determining when that duty arises requires an objective evaluation of the facts known to the insured. Id. The objective standard contemplates when there is a reasonable possibility of involvement of the subject reinsurance contract. Id. "[M]ere speculation, rumor or remote contingencies" are not sufficient to trigger the notice obligation, however, "when an insured complying with its duty to use due diligence in investigating potential claims against it would believe from the information available that its policy would be involved, the notice obligation arises." Id. at 275-76. The Second Circuit explained in Christiania:

> A provision requiring notice when it "appears likely" that a claim will or "may" involve a policy does not require a probability—much less a certainty—that the policy at issue will be involved. All that is required is a "reasonable possibility" of such happening, based on an objective assessment of the information available. Such a possibility may exist even though there are some factors that tend to suggest the opposite. . . . A "theoretical possibility" that a policy will *not* be involved is not an objectively reasonable basis upon which to conclude a claim does not "appear likely" to involve the policy.

Id. at 275 (emphasis added).

The evidence, viewed in the light most favorable to FFIC, demonstrates a reasonable insured in Utica's position could have believed it "appeared likely" the claims that it was being

told about from Goulds would involve FFIC's reinsurance. This is not to say that Utica was required to give notice to FFIC before February 1999, but merely that it cannot carry its burden on summary judgement to show that the undisputed facts could only render a fact finder to conclude that notice was not due until *after* February 1999. In sum, when the obligation to provide notice arose in this case cannot be determined on the face of the Certificates without resort to extrinsic evidence, and the record, viewed in the light most favorable to FFIC, would permit a rational jury to find a reasonably diligent insurance company in Utica's position would have thought itself required under the Certificates and industry practice to provide notice prior to February 1999. When notice is due is a uniquely factual issue and while Utica's motivations for making the instant motion can be appreciated, the determination is simply not one that can be made at this time, on these disputed facts. It is one more appropriately left for the fact finders to weigh the evidence and make credibility determinations.

Accordingly, Utica's motion for partial summary judgment that notice was not due before February 1999 will be denied.

## IV. CONCLUSION

This case is trial ready. Only Count I and defendant's counterclaims will move forward. Counts I and II are predicated on different wrongful conduct and seek different relief, and thus they may stand as separate causes of action. However, Count III is unnecessary as a stand alone cause of action as the declaratory relief sought can be awarded in accordance with Count I. The missing subject primary policies and the incomplete umbrella policies, coupled with the proposed expert and fact witnesses, voluminous exhibits, depositions, affidavits, and depositions, raise the reasonable possibility

that the primary policies did not have aggregate limits for bodily injury, in turn voiding FFIC's obligation to provide reinsurance coverage for the years 1966-72.  However, FFIC has shown through the undisputed material facts that Utica's bad faith damages claim cannot be sustained and Count II will be dismissed.  As to whether FFIC is constrained by Utica's settlement with Goulds by the follow the settlement, or follow the fortune doctrine, remains to be seen.  Whether Utica's settlement with Goulds was in good faith and reasonable, or unreasonable and improperly designed to access coverage under the Certificates, turn on factual determinations to be made at trial.  The triers of fact may find answers to the above factual disputes through the testimony of proposed witnesses, including Utica witness Dennis R. Connolly, whose expert testimony will not be precluded at this time.  The aforementioned evidence may also prove helpful to the fact finders in deciding whether FFIC may rescind the Certificates.  Finally, when notice from Utica to FFIC was due under the Certificates is a uniquely fact centered determination which is inappropriate for summary judgment.

Therefore, it is

ORDERED that

1.  Fireman's Fund Insurance Company's motion for judgment on the pleadings dismissing Counts II and III , ECF No. 276, is GRANTED in part and DENIED in part, and Count III is DISMISSED;

2.  Fireman's Fund Insurance Company's motion for partial summary judgment on Count I, ECF No. 279, is DENIED;

3.  Fireman's Fund Insurance Company's motion for partial summary judgment dismissing Count II, ECF No. 275/286 sealed, is GRANTED and Count II is DISMISSED;

4.  Fireman's Fund Insurance Company's motion for summary judgment on Count I, ECF No. 277/285 sealed, is DENIED;

5.  Fireman's Fund Insurance Company's motion in limine to preclude the expert testimony of Dennis R. Connolly, ECF No. 331, is DENIED;

6.  Utica Mutual Insurance Company's motion for partial summary judgment on the follow the fortunes doctrine, ECF No. 274/287 sealed, is DENIED;

7.  Utica Mutual Insurance Company's motion for partial summary judgment that FFIC is not entitled to rescission, ECF No. 283/289 sealed, is DENIED; and

8.  Utica Mutual Insurance Company's motion for partial summary judgment that notice was not due before February 1999, ECF No. 280/288 sealed, is DENIED.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  February 24, 2017
         Utica, New York.